STATE OF CONNECTICUT *v.* JERRY JOHNSON

INGLIS, C. J., BALDWIN, O'SULLIVAN, QUINLAN and WYNNE, Js.

Argued November 3, 1953—decided January 5, 1954

*Edward G. Burstein,* with whom, on the brief, was *Bernard Green,* for the appellant (defendant).

*James J. O'Connell,* prosecuting attorney, for the appellee (state).

QUINLAN, J.  The defendant was charged in the information with making, manufacturing or keeping, or being the custodian of, slips, tokens, papers, records or registers of bets or wagers, in violation of § 8675 of the General Statutes.  The court found him guilty and he has appealed.  The questions raised are (1) whether the court erred in admitting expert testimony as to the nature and purpose of slips of paper found on the defendant; (2) whether the court was warranted in concluding beyond a reasonable doubt that those slips were records in connection with the playing of policy or the numbers game; and (3), if they were, whether the defendant's possession of them was a violation of the statute.

In support of its charge the state introduced evidence from which the court found the following facts: About 7 a.m. on December 20, 1952, three police officers were near the gate of the Bassick Company plant in Bridgeport looking for a Buick car with numerals 417.  When it came out of the factory yard through the gateway and stopped for a signal light, one of the officers entered the car and asked the defendant operator if he had any "slips" on his person.  Upon receiving a negative answer to

his question, the officer began to search the defendant, who then suggested that they both go to police headquarters. There the defendant was thoroughly searched. In one pocket of his trousers were found several dollars in nickels, dimes and quarters; in another were found two cards. Written on the cards were several five-digit numbers, each with a dash between the third and fourth digits. When interrogated about the cards, the defendant replied that they were job cards of the previous night and that he had written the numbers appearing on them. The officer then remarked, "Well, there they are, there's the number and the dash and the amount played." To this statement, the defendant made no reply.

In order that the court might have some evidence upon which legally to determine the meaning of the numbers on the cards, the state called to the stand Lieutenant Halpin of the Bridgeport police department. After he had been qualified as one having expert knowledge of the mechanics of the numbers game, so-called, he was asked to express his opinion as to the significance of the numbers written on the cards. The objection then raised by the defendant was that any answer which the witness might give would, in effect, be a usurpation of the function of the court to determine what significance, if any, should be attributed to the numbers. The objection was overruled and the witness was permitted to express his opinion as to the meaning of the numbers. From the testimony of the officer the court found these additional facts: An individual desiring to gamble on the numbers game as carried out in the case at bar selects any combination of three digits. He tells a collector what his selection is and the amount he desires to bet. The collector then writes on a paper, which he retains, several digits, the first

three, representing the selected combination, being separated by a dash from the remaining digits, representing the amount bet. The winning combination is determined by taking the last whole number of the amount of money bet on the first three races at the most prominent race track then in operation as the first digit of the winning combination; the second digit is the last whole number of the amount of money bet on the first five races at that race track; and the third digit is the last whole number of the amount of money bet on the first seven races on the given day.

That Halpin was an expert on the subject matter of the numbers game was conceded, although his qualifications were also proven. In such an event, the court had a wide discretion in admitting his testimony. *Rogoff* v. *Southern New England Contractors Supply Co.,* 129 Conn. 687, 691, 31 A.2d 29; *Wray* v. *Fairfield Amusement Co.,* 126 Conn. 221, 224, 10 A.2d 600. Only through an expert's opinion could the court intelligently make a finding as to the purpose, if any, of the writings. The situation was of such a nature as to require an expert to express an opinion on the precise question upon which the court ultimately had to pass. *Lentine* v. *McAvoy,* 105 Conn. 528, 533, 136 A. 76; *St. George Pulp & Paper Co.* v. *Southern New England Telephone Co.,* 91 Conn. 563, 570, 100 A. 358. The court did not abuse its discretion in admitting Halpin's testimony.

In addition to that evidence, there was the fact of the presence on the person of the defendant of a large amount of nickels, dimes and quarters. Also there was his statement in reply to one of the officers that the cards he had were job cards; and there was his failure to respond to the same officer when he said, "Well, there they are, there's the number and the

dash and the amount played." From the circumstances, and in view of the previous statement of the defendant that the cards were job cards, the court was warranted in concluding that when confronted by a characterization of them, he not only heard but understood and comprehended the meaning of the characterization and preferred to remain silent when a reply was naturally to be expected. *State* v. *Bates,* 140 Conn. 326, 329, 99 A.2d 133. Not only was his statement that the cards were job cards uncorroborated, but the defendant himself did not take the stand. There was sufficient evidence for the court to draw such fair and reasonable inferences as made out a prima facie case. At that stage of the case, the court was permitted to draw from the defendant's failure to testify an unfavorable inference against him. *State* v. *McDonough,* 129 Conn. 483, 487, 29 A.2d 582. On all of the evidence the court clearly was warranted in finding beyond a reasonable doubt that the defendant had on his person slips which were records made in connection with the playing of policy or the numbers game.

The defendant's remaining contention is that even though the papers found upon him were records made in connection with policy playing, he did not come within the prohibition of § 8675 of the General Statutes, under which he was convicted. That section is entitled "Policy playing; gaming by use of lottery slips or tickets." After prohibiting a long list of acts done in connection with the making of bets or wagers upon the result of a drawing in any lottery or of the drawing of any numbers by chance, the statute provides that any person who "shall make, manufacture or keep, or be the custodian of, any slips, tokens, papers, books, records or registers of bets or wagers . . . shall be fined. . . ." The defend-

ant argues, first, that there was no evidence that he was a custodian of the slips and, second, that the statute in the particular phrase quoted does not prohibit the custody of records in connection with policy playing but only of records of bets or wagers made upon the result of a drawing in a lottery or the drawing of numbers by chance.

To have custody of a thing means to have temporary physical possession of it. It does not necessarily involve a domination over the thing. *Hancock* v. *Finch,* 126 Conn. 121, 123, 9 A.2d 811. Plainly, on the facts found, the defendant was the custodian of the slips.

The basis of the defendant's further argument concerning the interpretation of the phrase quoted from the statute is that whereas at several other points the statute speaks of "bets or wagers" or "wagering or betting," these terms are used in association with the words "upon the result of any drawing in any lottery, or in any drawing of any numbers by chance." The defendant also points out that the other references in the statute to wagering or betting upon the result of a drawing are often used disjunctively with the word "policy" or the phrase "business, scheme or occupation, commonly known as policy," as if to distinguish policy from wagering or betting upon the result of a drawing. From this he argues that his custody of the cards was not covered by the statute since they were cards used in a game of policy rather than in wagering or betting upon the result of a drawing in a lottery or any drawing of numbers by chance. That argument is not convincing. Policy playing is a form of gambling by betting as to what numbers will be drawn in a lottery or otherwise determined by chance. *State* v. *Carpenter,* 60 Conn. 97, 102, 22 A. 497. The statute "does

not make policy playing a distinct crime but treats it only as one form of gaming within the broader field covered by the statute." *State* v. *Mola,* 128 Conn. 407, 410, 23 A.2d 126. The words "bets or wagers" as used in the statute are broader than such words as "lotteries" or "policy playing" or "numbers games" but they include such forms of gambling. When a person plays policy or the numbers game, he makes a bet or wager. Consequently, a record of a bet made in the playing of policy or the numbers game is the record of a bet or wager as the term is used in the statute.

The court was not in error in concluding that the defendant was guilty of the crime charged, beyond a reasonable doubt.

There is no error.

In this opinion the other judges concurred.