STATE OF CONNECTICUT *v.* EDWARD C. PALMER
(12245)
(12509)

PETERS, C. J., HEALEY, PARSKEY, DANNEHY and SANTANIELLO, Js.

Argued February 6—decision released May 7, 1985

*John R. Williams,* for the appellant (defendant).

*Frank S. Maco,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

PARSKEY, J. The defendant has appealed from his convictions in two cases. In the first case, after a jury trial, the defendant was convicted of the crimes of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2) and theft of a firearm in violation of General Statutes § 53a-212 (a). The defendant received a sentence of ten to twenty years on the robbery charge and a consecutive sentence of two and one-half to five years on the theft charge for a total effective sentence of twelve and one-half to twenty-five years. In the second case the defendant pleaded guilty to charges of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35, and received a sentence of six to twelve years on the burglary charge to run concurrently with the sentence imposed in the first case, and a consecutive sentence of two to three years on the pistol charge, the second sentence also to run consecutively with the sentences imposed in the first case.

In the first case the defendant claims that he was denied due process of law by the state's loss of key exculpatory evidence, and by the court's permitting the state's attorney to inform the jury that he was providing defense counsel with all prior statements of prosecution witnesses. He further asserts that the court erred in allowing expert testimony concerning similarities between the defendant and a police sketch artist's drawing of the perpetrator of the crimes charged. The defendant also claims that in its charge to the jury the court unconstitutionally diluted the presumption of innocence. In the second case the defendant claims that in making one of the sentences consecutive to the sentences imposed in the first case the court violated the double jeopardy clause of the federal constitution. We find no error in either case.

## I

The robbery in the first case occurred on November 28, 1980. The victim of the robbery, Frank Taylor, was a special police officer at the University of Bridgeport, where the robbery occurred. Taylor was held up at gun point and relieved of his .38 caliber Colt diamond back revolver and his wallet containing some money and other items of personal property. At the time of the robbery the assailant was wearing a hooded parka which covered his chin and the perimeter of his face. Taylor, in reporting the robbery to the Bridgeport police, described his assailant as a black male, five feet ten inches tall, 160 to 170 pounds, twenty-seven years old, dark skinned, possibly with a thin moustache and wearing a green parka-type coat with a fur-lined hood, tied under the chin. Thereafter, he gave a description to officer Michael Barrett, a suspect sketch artist, from which description Barrett prepared a composite sketch of the suspect. Photocopies of the sketch were made and the original was placed in the police file.

On April 8, 1981, the court, *Ment, J.,* upon the defendant's motion, ordered the state to provide the defendant, inter alia, with "[a]ny and all exculpatory information and materials and any and all books, tangible objects, papers, photographs and/or documents which are within the possession, custody or control of any State agency, including, but not limited to, any local police department, and which are intended for use by the prosecuting attorney as evidence at the defendant's trial or which are material to preparation of the defense." On June 11, 1981, the state responded to this order by disclosing that any such materials were "[a]vailable for inspection upon appointment." The state asserts, and the defendant does not dispute, that the defendant never sought an appointment to examine the requested material.

The original of the composite sketch was lost before the commencement of the defendant's trial. A photocopy of the sketch was introduced into evidence by the state in its place. The defendant claims that because Taylor had described his assailant as dark skinned and the defendant was in fact light skinned, the state's loss of the original sketch deprived him of presumably exculpatory evidence and therefore denied him due process of law. We disagree.

The defendant made a general request for any exculpatory information and the order of the court to provide the defendant with such information was fashioned in the same general form of the request. In such situations there is no duty to disclose unless the exculpatory nature of the information in the hands of the prosecutor is obvious. *United States* v. *Agurs,* 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). The original sketch cannot be characterized as obviously exculpatory. The state's witnesses testified that the facial shading on the missing original was lighter than

that of the photocopy admitted into evidence. They reached this conclusion from personal observation and from the fact that the photocopying process tends either to darken the original picture or to blur any differences in shading. Except for the defendant's bald assertion, there was no showing that the original sketch was exculpatory at all and, if so, that its exculpatory nature was obvious. Indeed, if the description of the original was accurate, the original bore a closer resemblance to the defendant than did the photocopy.

The defendant claims that he was denied due process by virtue of the state's alleged failure to disclose the existence of the original sketch and by its loss. The defendant's nondisclosure claim is not factually supported. The defendant filed a general request for any papers, photographs and documents intended for use by the prosecuting attorney at the defendant's trial or which were material to preparation of the defense. The prosecuting attorney quite properly responded that such material was available for inspection by appointment. The state had no obligation to turn the original sketch over to the defendant. Under Practice Book § 741 the state's duty is limited to making the sketch available to the defendant for inspection and copying. In its disclosure the state advised the defendant that any photographs, papers or documents he sought were available for his inspection. Had the defendant availed himself of the opportunity, he could have made his own comparison between the original sketch and the photocopy. Since he chose not to do so, for whatever reason, he cannot now be heard to complain.

Whether the defendant, due to the loss of the original composite sketch, has been deprived of a fair trial depends on "the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, and the reasons for its nonavailability to the defense. *United States* v. *Herndon,* 536 F.2d

1027, 1029 (5th Cir. [1976])." *State* v. *Harden,* 175 Conn. 315, 326–27, 398 A.2d 1169 (1978). In cases where the defendant claims that he was prejudiced by the loss of allegedly exculpatory evidence, "[i]t is very often true, and it is true here, that the materiality of the evidence in question is key." *State* v. *Doolittle,* 189 Conn. 183, 197, 455 A.2d 843 (1983). Where, as here, the defendant has made only a general request for exculpatory material, "his conviction will be constitutionally flawed only 'if the omitted evidence creates a reasonable doubt [as to his guilt] that did not otherwise exist . . . .' *United States* v. *Agurs,* supra, 112 . . . ." Id., 198. In this case the loss was not deliberate and occurred after the defendant chose not to inspect the sketch. Furthermore, the copy that was introduced into evidence showed a darker facial shading than that possessed by the defendant and therefore permitted the defendant to emphasize this dissimilarity. Although Taylor testified that the original sketch was lighter in skin tone and that the shading was darker in the copy due to the photocopying process, the defendant was not precluded from offering evidence that photocopying did not produce the result suggested by the state's witnesses. Moreover, the photocopy tended to corroborate Taylor's initial description of his assailant as a dark skinned black male and therefore would seem to have helped rather than hurt the defendant's case. We cannot conclude that the jury could have misinterpreted the photocopy to the defendant's detriment or, in view of all of the other identification evidence presented, that the absence of the original sketch may have changed the result.[1]

---

[1] The other identification evidence consisted of a verbal description of the alleged perpetrator given by the victim to the police shortly after the robbery occurred, the victim's identification of the defendant in a six-man line-up several months later, and an in-court identification by the victim at the trial. The victim testified that although the hood worn by the robber had covered his chin and the perimeter of his face, he was able to observe the unobscured features of his assailant at close range during the course of the crime.

## II

After Taylor was sworn as a witness for the state the defendant requested that the jury be excused, to which the prosecuting attorney responded in the presence of the jury as follows: "For what purpose? The State at this time is prepared to comply by [sic] an order of a judge of this court relative to the turning over of statements of the witness that has been called to the stand. That's Mr. Frank Taylor and I'm doing so at this time." Thereafter, the defendant, in the absence of the jury, moved for a mistrial on the ground that the remarks of the prosecutor prejudiced the defendant's right to a fair trial. At an earlier stage of the proceedings, the court, *Ment, J.,* had ordered that any statements of a state witness be turned over to the defendant at the time the witness took the stand. Just before Taylor was called to the stand, the defendant requested that Taylor's prior statements be turned over to him while the jury was absent. The trial court sustained the objection of the prosecuting attorney and denied the request. The court also denied the defendant's motion for a mistrial.

The basis for the defendant's motion for mistrial, and his due process claim on appeal, is that "the prosecutor's acts and statements constituted a deliberate effort to accredit his own witness by informing the jury of prior consistent statements made out of court by that witness." "The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been deprived of the opportunity for a fair trial. . . . The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Citations omitted.) *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001,

cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). Measured against that standard, the occurrence did not deny the defendant a fair trial.

We agree with the United States Circuit Court of Appeals for the Second Circuit that allowing circumstances to arise at a trial which create the possibility that a jury may draw an inference of a prior consistent statement does not, of itself, constitute reversible error. *United States* v. *Gardin*, 382 F.2d 601, 605 (2d Cir. 1967). Although the possibility of prejudice could have been avoided had the court under the circumstances of this case acceded to the defendant's reasonable request that the statement be turned over to him in the absence of the jury, the defendant has not met his burden of showing actual harm. The defendant cross-examined Taylor extensively concerning the identification procedures employed in the case and especially his initial description of the alleged assailant, which varied in certain respects from the defendant's actual appearance. The defendant does not claim that his opportunity to cross-examine Taylor was insufficient in any respect, and, aside from the prosecutor's brief statement that he was supplying the defense with "statements of the witness that has been called to the stand," the defendant has pointed to no other references to these prior statements made in the jury's presence. On this record, we cannot conclude that the single remark of the prosecutor deprived the defendant of his right to a fair trial. While we are not inclined to lay down a hard and fast rule for dealing with the prior statements of witnesses and prefer that the procedure to be followed be left to the discretion of the trial court, we see much merit in the prophylactic procedural suggestion outlined in *United States* v. *Gardin*, supra, 605.[2]

---

[2] "After the completion of the witness' direct testimony and before cross-examination has been concluded, the defendant will state that he requests leave to make a motion in the absence of the jury; the trial judge will then

## III

Michael Barrett, a suspect sketch artist with the Westport police department, testified as a witness for the state. After interviewing Taylor on November 29, 1980, Barrett had prepared a composite sketch of Taylor's assailant. Over the defendant's objections, Barrett was permitted to give his opinion with respect to the similarities and dissimilarities of the spatial features of the person depicted in the composite sketch and the defendant's photograph, and to give a similar opinion with respect to the composite sketch and the defendant in the courtroom. The spatial features referred to in the posed question related to the spatial relationship of the eyes, the relationship of the eyes to the bottom of the nose, the space between the bottom of the nose and the top of the upper lip and the shape of the upper lip. The defendant objected on the grounds that the question related to a subject that was not proper for expert testimony because it went to the ultimate question to be determined by the jury, that the witness was not qualified as an expert on identification or appearances and that there is no scientific basis for offering expert testimony on the subject.

excuse the jury, and, in its absence, the defendant will move for disclosure of Jencks Act material. Thereafter all steps through the delivery to the defendant of the statement or report, or the portions thereof, to which the defendant is found to be entitled, and including the allowance of a reasonable time to the defendant to examine the material, will take place while the jury is still absent. If, thereafter, the defendant decides to make use of any of the material for cross-examination of the witness, he will be permitted to do so only upon condition that he state preliminarily to the court and jury that he is about to question the witness on the basis of a written statement or report which the Government has made available to the defendant as required by law. This is to negative any inference that the Government had been covering something up and will precede compliance with the general rule of evidence for the protection of the witness which requires the laying of a proper foundation for the introduction of a past contradictory statement." (Footnote omitted.) *United States* v. *Gardin,* 382 F.2d 601, 605 (2d Cir. 1967).

"The true test for the admissibility of expert testimony is 'whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the question at issue.' " *Schomer* v. *Shilepsky,* 169 Conn. 186, 191, 363 A.2d 128 (1975), quoting *Taylor* v. *Monroe,* 43 Conn. 36, 44 (1875). The test for admissibility is not limited to matters of scientific knowledge. "Generally, expert testimony may be admitted if the witness has a special skill or knowledge, beyond the ken of the average juror, that, as properly applied, would be helpful to the determination of an ultimate issue." *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973). The trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the error is clear and involves a misconception of the law, its ruling will not be disturbed. *Going* v. *Pagani,* 172 Conn. 29, 35, 372 A.2d 516 (1976).

The issue here was not solely whether the composite sketch and the photograph looked alike. For that purpose expert testimony was unnecessary and would have been inadmissible. The value of Barrett's testimony is that it taught the jury how to view the materials before them by focusing their attention on the relationship of certain facial features. Barrett was not asked whether it was the defendant who was depicted in the composite sketch. Instead he directed the jury's attention to the space between the eyes, the relationship of the eyes to the bottom of the nose, and the space between the bottom of the nose and the top of the upper lip, opined that these spaces and relationships were similar on the sketch and the photograph and noted the same similarities between the sketch and the defendant. He also noted several dissimilarities such as the

shape of the upper lip and eyes. We cannot say as a matter of law that the jury could not have been aided by such information.

A similar issue was addressed in *United States* v. *Brown*, 511 F.2d 920 (2d Cir. 1975). *Brown* involved an armed bank robbery. The robber had been photographed by the surveillance camera during the course of the robbery. A special agent of the F.B.I., who was chief of the Special Photograph Unit, was asked to compare the surveillance photograph with a known photograph of the defendant. Over the objections of the defendant that the agent's testimony was not a proper subject for testimony as an expert and that it usurped the function of the jury who could see the defendant present in the courtroom and could make their own evaluation of the surveillance photographs without any assistance from the agent, the agent was permitted to render his expert opinion " 'that these photographs were all consistent and that these are either photographs of the same person or a person of the same features.' " Id., 924. In addition, the expert, a Mr. Webb, testified with regard to a diagram he had prepared. The court, in approving the admission of such testimony, observed: "By making careful measurements and placing Brown in a position as nearly as possible identical with his location in the bank according to the surveillance photographs that were taken, Mr. Webb with both sets of photographs made some mathematical calculations set forth in a diagram and testified that the height of the man robbing the bank and the height of Brown were about the same." Id.

Whether a witness is qualified to testify as an expert with respect to a certain matter is a decision to be made by the trial court. "The underlying principle is that if any reasonable qualifications can be established, the objection goes to the weight rather than to the admissibility of the evidence." *Wray* v. *Fairfield Amusement*

*Co.,* 126 Conn. 221, 224, 10 A.2d 600 (1940). It is rare for this court to find that a trial court has erred in a ruling permitting expert testimony. *McKiernan* v. *Caldor, Inc.,* 183 Conn. 164, 168, 438 A.2d 865 (1981). Barrett's fifteen years of experience as a portrait painter, his specialized training in the field of portrait painting and his four years of experience with the Westport police department as a composite sketch artist were sufficient to justify the trial court in permitting him to give his comparison testimony.

## IV

Finally, the defendant challenges that portion of the charge wherein the trial court stated to the jury that "the law is made to protect society and innocent persons and not to protect guilty ones," claiming that such instruction violated his right to the presumption of innocence. Reviewing this language in *State* v. *Just,* 185 Conn. 339, 441 A.2d 98 (1981), we held (p. 353) that when this language is used in conjunction with a clear instruction both as to the presumption of innocence and as to the duty of the state to prove beyond a reasonable doubt the defendant's guilt of the crimes charged, such language is both proper and correct. The court here not only clearly and specifically instructed the jury on the presumption of innocence and the necessity of the state to prove each and every element of the crimes charged beyond a reasonable doubt, but following the challenged language also stated: "If this presumption of innocence has been overcome or removed by evidence clearly demonstrating beyond a reasonable doubt that an accused person is guilty of the crime charged, then it is the sworn duty of the jury to enforce the law which is made for the protection of life, society and property and to render such a verdict as the evidence warrants." Examining the questioned instruction both in the context of the portion of the charge in which it was used as well as in the context of the charge as a

whole, we see nothing to suggest that the challenged language qualified or diluted the presumption of innocence, or that it might have misled the jury to suppose that the defendant could only invoke the presumption after he had established his innocence.

V

In the second case the defendant entered a "guilty" plea under the *Alford* doctrine[3] to the crimes of burglary in the second degree in violation of General Statutes § 53a-101 (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35. The sentence under the burglary charge, six to twelve years, was to run concurrently with the sentences imposed in the first case. The sentence under the pistol charge, two to three years, was to run consecutively to the burglary sentence and consecutively to the effective sentence imposed in the first case. The defendant claims that his consecutive sentence on the pistol charge violated the constitutional prohibition against double jeopardy. We do not agree.

The sentences in the first case were imposed on June 10, 1983. At that time the charges in the second case, which were still pending against the defendant, had not resulted in a conviction. A conviction occurs as a result of a verdict or plea of guilty. *State* v. *Marra,* 174 Conn. 338, 345, 387 A.2d 550 (1978); *Quintard* v. *Knoedler,* 53 Conn. 485, 487, 2 A. 752 (1885). The defendant, when initially arraigned on the charges in the second case, entered a plea of not guilty. He did

---

[3] A plea of guilty is a confession of guilt of the crime charged. It is in effect a conviction and the equivalent of a finding of guilty by a jury. *State* v. *Battle,* 170 Conn. 469, 473, 365 A.2d 1100 (1976). A guilty plea under the *Alford* doctrine is a judicial oxymoron in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless. In *North Carolina* v. *Alford,* 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), the United States Supreme Court treated such guilty pleas as the functional equivalent of a plea of nolo contendere.

not change his plea to guilty until October 27, 1983, the day he was sentenced. The defendant has not challenged the propriety of the sentences imposed in the first case in any respect. His claim that the June, 1983 sentences for robbery and theft also covered the pistol charge is unsupported by the record, and, more importantly, the court would have lacked jurisdiction to impose any sentence on this charge in the absence of a conviction. The most that the defendant could claim is that in June, 1983, the court in imposing sentence in the first case impermissibly considered undisposed charges against him, a claim which the defendant has not chosen to assert in the first case either at the trial or in this court on appeal. While a double jeopardy claim may be grounded on an assertion of autrefois convict, absent a conviction such claim founders.

There is no error in either case.

In this opinion HEALEY and DANNEHY, Js., concurred.

PETERS, C. J., with whom SANTANIELLO, J., joins, concurring. I agree with parts I, II, IV and V of the majority opinion, and concur with the result in part III dealing with the admissibility of the challenged expert testimony. In my view, it was error to admit that testimony, but the error was, in light of the other relevant evidence at trial, harmless.

My disagreement with the majority stems from my disagreement about the nature of the issue before us. I agree with the majority that the sketch artist was an expert witness, and that he was qualified to offer expert testimony about the genesis of the sketch that he had created. In the course of explaining how his sketch represented what he had been told by the victim, the artist was qualified to explain his focus on certain facial features and spatial relations. He could properly have

focused the jury's attention on such characteristics to aid the jury in weighing of the usefulness of the sketch on the issue of the defendant's identity. I have been able to find no authority, however, for the proposition that expertise in the creation of a sketch authorizes testimony whose subject is a comparison between the sketch and the defendant himself, in person or in a photograph.

The importance of precise delineation of the issue is highlighted by the majority's reliance on *United States v. Brown,* 511 F.2d 920 (2d Cir. 1975). In *Brown,* the expertise of the witness lay not merely in creating photographs but rather in "comparing surveillance bank robbery photographs with known photographs of persons sought to be identified." Id., 924. *Brown* is further distinguishable because the expert there was comparing pictorial representations whose accuracy was unquestioned. Since the challenged testimony in this case dealt with a subject outside the artist's designated field of expertise and involved a sketch whose accuracy was an issue for the trier of fact to determine, the testimony should have been excluded because of its capacity to mislead the jury into an erroneous identification.

The conclusion that the testimony was inadmissible does not, however, end the inquiry. It is familiar ground that evidentiary errors that are harmless do not require the order of a new trial. In this case, there was other credible and properly admissible evidence to identify the defendant as the person who had committed the crimes with which he was charged. The expert evidence was therefore cumulative and its erroneous admission harmless.

For these reasons, I concur in the judgment.