STATE OF CONNECTICUT *v.* JOSEPH GIROLAMO
(12342)
(11622)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

202

Argued May 3—decision released August 13, 1985

*Jon L. Schoenhorn,* with whom, on the brief, was *Joseph Rubin,* for the appellant (defendant).

*Susann E. Gill,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, *Kevin Kane, Timothy McNamara* and *Carl Schuman,* assistant state's attorneys, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant has appealed from convictions after two separate criminal trials. The defendant was convicted by a jury, in May, 1982, of

two counts of theft of a firearm in violation of General Statutes § 53a-212 and of fourth degree larceny by receiving stolen property in violation of General Statutes §§ 53a-119 and 53a-123. In a separate jury trial in June, 1982, the defendant was convicted of two counts of conspiracy to commit first degree larceny in violation of General Statutes §§ 53a-48 and 53a-122 and of first degree larceny in violation of General Statutes §§ 53a-119 and 53a-122.

Although the claim of error raised by the defendant in his appeal from each trial rests on its own merits, the appeals were consolidated as certain pretrial motions and the sentencing proceedings were conducted jointly.[1]

I

DOCKET NO. 12342: MAY, 1982 CONVICTION

The defendant's first claim of error with respect to the May, 1982 trial is the admission by the trial court into evidence of two automatic handguns which were not relevant to any issue before the jury. The state con-

[1] Although these cases were tried separately, one in May, 1982, and the other in June, 1982, the defendant was sentenced on all these convictions at the same time in September, 1982, by the court, *Borden, J.* The defendant received a sentence of one year imprisonment for each of the two counts, the terms to run concurrently, in the May, 1982 convictions (Docket No. 12342). (The transcript indicates that the defendant also received a $1000 fine, although the record states that the fine was $1000 for each count. In view of our disposition of the appeal, this discrepancy is not critical.) In the May, 1982 convictions, the defendant also received a three month sentence to run concurrently with all sentences imposed and a $500 fine for the conviction of receiving stolen property. For the June, 1982 convictions (Docket No. 11622), the defendant received a three year prison sentence and a $7500 fine for each of the first two counts, the sentences to be consecutive; the defendant received an additional three year sentence to run concurrently with the other sentences. The court also assessed costs against the defendant.

The total effective sentence received by the defendant in these cases was six years incarceration, a $16,500 fine, and costs. In light of our disposition of these appeals, the defendant's effective sentence remains the same, but the fines are to be diminished accordingly.

cedes that the trial court erred in admitting the guns because the guns were not relevant to the issues in the case. The state argues, nevertheless, that the error does not require reversal because the defendant has not sustained his burden of proving harmfulness.

This first trial centered on charges arising out of the seizure of two "showpiece" magnum handguns and a television set, items that had been reported to the police as stolen during burglaries in 1979. These items were found in the defendant's home when searched under a warrant in February, 1980.

It was during the same police search that revealed these stolen items that the two automatic handguns, rightfully in the defendant's possession, were also discovered. All of the handguns that were found were seized for the protection of the officers according to the testimony of police officers at trial.

The introduction into evidence of the automatic handguns,[2] a .25 caliber Colt and .380 caliber Lama, occurred despite two motions by the defendant to suppress. The first motion to suppress the guns, as well as other items seized during the search, alleged that the warrant for the search of the defendant's house was issued without probable cause. The motion was denied without prejudice on March 23, 1982. The defendant renewed his motion to suppress just prior to his trial in May, 1982, and a full evidentiary hearing was held. At this hearing, the police officers who conducted the search were questioned as to the scope of the search. In addition, the departmental police policy of seizing any guns found during a search for the safety of the officers involved was explored extensively by both sides. The trial court denied the second motion to suppress on May 12, 1982.

---

[2] These automatic handguns were not the subject of any criminal charges brought against this defendant, and the state has never claimed that either of these handguns was held illegally by him.

At trial, the state did not attempt to introduce the two automatic weapons in question until after the defendant's counsel cross-examined one of the investigating officers. During cross-examination the officer stated that there were guns, other than the two showpiece guns, on the defendant's premises.

On redirect examination, the state continued and expanded the questioning of the police officer concerning the automatic weapons. The state then attempted to offer into evidence the .25 caliber Colt pistol the police officer identified as one of the two guns found in the defendant's bedroom. The defendant objected and the jury was excused. The grounds of the defendant's objection were that the automatic pistols were not related to the charges against the defendant and that these guns were immaterial, irrelevant and prejudicial. The objection was overruled on the ground that the "probative value [of the guns] outweighs the prejudicial effect." The state then made an offer of proof that included the .380 caliber Lama automatic as well as the .25 caliber Colt automatic. Both automatic pistols were ruled admissible. After a discussion between the trial court and counsel, which was extraneous to this prior ruling, the trial court, sua sponte, reversed itself on the admissibility of the automatic pistols. In doing so, the court stated that the guns "have no direct relevance to the issues in the case" and that to have them as "physical" exhibits in the case "gilds the lily" and "creates more of a prejudice than a probative value." The jury then returned. The defendant's counsel, on the recross-examination of the police officer, questioned him about his reasons for seizing unloaded guns. The officer again responded, as he had during the suppression hearing, that the departmental policy was to seize all guns for the "safety of the officers involved."

Upon the second redirect examination of this officer by the state, he explained the instructions that the offi-

cers had been given concerning the seizure of handguns during searches. During this questioning, the discovery of the two loaded automatic pistols in the defendant's bedroom was again developed. The state attempted for a second time to offer the two automatic handguns; the defendant objected for the same reasons of relevancy and prejudice. The trial court then ruled that the guns were now admissible because "at this point the probative value outweighs the prejudicial effect and because of the recross and redirect . . . ." The defendant's claim of prejudicial error arises out of this admission into evidence of the two automatic handguns as full exhibits.

The trial court, after the admission of the two automatic handguns as full exhibits, gave a limiting instruction to the jury about the purpose of the admission of the guns. The jury was told that the guns were only introduced to corroborate testimony that the guns were seized during the search for the safety of the police.

In conceding that the trial court erred in admitting into evidence the two automatic handguns, the state acknowledges that the error in the admission stems from the lack of relevancy of the automatic guns to the guilt or innocence of the defendant as to the pending criminal charges. According to the state, the automatic guns were probative only on the issue of the police officers' motivations for the seizure of the guns during a search. The legality of the search is not, however, an issue in this appeal.

The dispositive issue, therefore, arising out of the defendant's May, 1982 trial is whether the error of the trial court in admitting into evidence the two automatic handguns seized in connection with the stolen guns was harmful error. We hold that it was.

"This court has consistently indicated that ' " '[a]ny improper evidence that may have a tendency to excite

the passions, awaken the sympathy, or influence the judgment, of the jury, cannot be considered as harmless.' " *State* v. *Loughlin,* 149 Conn. 21, 26, 175 A.2d 367 [1961]; see *State* v. *Acklin,* [171 Conn. 105, 115–16, 368 A.2d 212 (1976)]; *State* v. *Ferraro,* [160 Conn. 42, 45, 273 A.2d 694 (1970)].' *State* v. *Onofrio,* 179 Conn. 23, 32–33, 425 A.2d 560 (1979)." *State* v. *Williams,* 190 Conn. 104, 109, 459 A.2d 510 (1983); see also *St. Martin* v. *New York, N.H. & H. R. Co.,* 89 Conn. 405, 411, 94 A. 279 (1915).

The jury had before it, during the trial as well as during deliberations in the jury room, the two automatic weapons, each with clips with a number of live rounds of ammunition. Additionally, the police officer who testified to the seizure of the weapons had demonstrated to the jury, using the .25 caliber Colt handgun, the ease with which a user of the gun could put a shell into its chamber. Another police officer testified, prior to the offer of the automatic guns into evidence and without objection by the defendant, to the discovery of the two loaded automatic weapons during the search of defendant's house. Although this testimony was admitted without objection, it was not, as the state claims, "merely cumulative." Rather, with the introduction of the irrelevant guns as demonstrative evidence, at the very least the jury could have believed that the defendant was a violent individual. *State* v. *Ferraro,* supra, 46; cf. *State* v. *Villafane,* 171 Conn. 644, 675–76, 372 A.2d 82, cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977).

The trial court's attempt to cure the error of its admission by a limiting instruction was not sufficient to overcome the prejudicial effect of the weapons as a full exhibit. The limiting instruction informed the jury that the automatic weapons were not claimed by the state to have been stolen and that there was nothing illegal about the defendant's possession of these guns

in his house. The jury was told not to draw any inference of guilt from the defendant's possession of these weapons but merely to consider them as corroborative of the officer's testimony that the guns were seized for the "safekeeping" of the officers. We have stated, however, that "a curative instruction is not inevitably sufficient to overcome the prejudicial impact" of inadmissible evidence. *State* v. *Tinsley,* 180 Conn. 167, 170, 429 A.2d 848 (1980); see *State* v. *Binet,* 192 Conn. 618, 633, 473 A.2d 1200 (1984).

The jury was still left with the tangible exhibits, i.e., the automatic handguns, in the jury room while deliberating the charges brought against the defendant. "Real proof often has enormous apparent probative force because the lay trier may lose sight of the fact that its connection to a party may depend upon the credibility of an authenticating witness"; 5 Weinstein, Evidence (1982) § 901 (a) [01]; or, as in this case, is not relevant to the innocence or guilt of the defendant. In addition, "the sight of deadly weapons . . . tends to overwhelm reason and to associate the accused with the [crime] without sufficient evidence." 4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1157, p. 340. For these reasons, especially in view of the irrelevance of the two automatic guns to the charges against the defendant, we cannot say that the error was harmless. Although the trial court is ordinarily allowed wide discretion in admitting evidence, that discretion is not without limits. See *State* v. *Onofrio,* 179 Conn. 23, 425 A.2d 560 (1979), and *State* v. *Acklin,* 171 Conn. 105, 368 A.2d 212 (1976). Both *Onofrio* and *Acklin* involved the erroneous introduction into evidence of physical exhibits, masks and ropes in *Acklin,* and photographs of guns in a room in the defendant's house in *Onofrio,* which were irrelevant to the main issues in those cases.[3] See also *State*

---

[3] The state in *Acklin* did claim that the physical items were relevant to a claim of conspiracy. We labeled such a claim "at best, tenuous." *State*

v. *Williams,* 182 Conn. 262, 269–70, 438 A.2d 80 (1980) (error to admit into evidence a gun when there was no evidence to show that a deadly weapon had even been used in the commission of the robbery); *State* v. *Groos,* 110 Conn. 403, 148 A. 350 (1930) (a roll of false money bearing resemblance to paper money as well as "obsolete" Polish money introduced as exhibits at trial constituted reversible error when no justification was found for the admission of the exhibits).

The court erred in admitting the automatic guns into evidence, and under the circumstances the error cannot be considered harmless.

## II

### DOCKET NO. 11622: JUNE, 1982 CONVICTION

The defendant's second claim, arising from his June, 1982 trial, is that the trial court erred in admitting a police officer's rebuttal opinion testimony because it was not based on an adequate foundation. The claim is without merit.

The jury could reasonably have found the following facts. The state's witness, Marc Manns, and his two companions, Steven Almeida and Joseph Dillard, met with the defendant to discuss a plan to rob a jewelry store. The defendant told the three companions that they should take "one, two, three carat jewels" and suggested that they choose jewelry stores in smaller suburban towns. Almeida and Dillard asked for $150 so that they could buy drugs before they attempted the robbery. After first stopping to purchase heroin and cocaine and to steal a car, the trio robbed a jewelry store in Plainville. After the robbery, the trio returned

---

v. *Acklin,* 171 Conn. 105, 115, 368 A.2d 212 (1976). In *Onofrio,* the state did not claim that "the weapons depicted in the photographs had anything whatsoever to do with the offense for which the defendant was being tried." *State* v. *Onofrio,* 179 Conn. 23, 31, 425 A.2d 560 (1979). In both *Onofrio* and *Acklin,* we found error.

with the jewelry to Manns' mother's house in New Britain and then proceeded to the defendant's residence to sell him the jewelry stolen in Plainville.[4] After some discussion, the defendant agreed to give each of the trio $1000 for the jewelry but was unable to pay them the full amount that evening. Manns went alone to the defendant's place of business the next day to sell some jewelry he had withheld on the day before and to collect the amount remaining on his $1000 payment.

Manns, Dillard and Almeida again met with the defendant, a few days after the Plainville robbery, to get a gun to use in a jewelry store robbery the three men planned to commit in New London. Dillard and Almeida needed money because they no longer had the money that they had received from the defendant for the Plainville robbery. The defendant gave Dillard a Luger pellet gun in response to their request for a gun to use in the robbery. The defendant told them to be careful and to take "one, two, three carat jewels" because the other merchandise, regardless of the price tag on it, "doesn't have much value on it." The second robbery was committed on July 24, 1981, in New London, and $144,000 worth of jewelry was taken.[5] The trio then went to the defendant's house to sell approximately one-half of the jewelry taken in the robbery, as they believed that he had not dealt fairly with them when they sold him the merchandise stolen in the Plainville robbery. The defendant discussed with them a payment of $3500 for each of the trio, but the full amount was never paid.

---

[4] The owner of the Plainville jewelry store that was robbed testified that the market value of the items taken in the robbery was $72,000 and that he settled with his insurance company for $34,000 less his $5000 deductible.

[5] The owner of the New London jewelry store that was robbed testified that the retail value of his merchandise that was stolen was $144,000 and that his cost was $75,000. These figures, he testified, did not include the value of customers' merchandise that was also stolen.

The primary issue in this appeal arises out of the testimony of Manns, the state's key witness.[6] Manns' testimony provided most of the specific information in the trial about the involvement of the defendant with Manns, Dillard and Almeida. On direct examination, Manns stated that the motives for the robberies and the sale of the jewelry to the defendant were to "raise capital" for himself[7] and to get money to support Dillard's and Almeida's drug habits. Manns specifically denied that he ever sold drugs or that he used any drugs other than marijuana.

On cross-examination, the defendant attacked Manns' credibility and attempted to rebut Manns' claims that he did not use or sell drugs. The defendant introduced evidence through two witnesses, Roger Pina and Eric Baldwin, that Manns was involved with drugs. Pina, who had a prior felony conviction, said that he had known Manns for "about maybe fifteen years," and that he was "a liar." Pina also testified that Manns was "one of the biggest" drug dealers in New Britain that he had "seen in twenty years" and that consequently he often had large sums of money.[8] Pina stated that

---

[6] Neither Joseph Dillard nor Steven Almeida was a witness at the trial.

[7] Manns also testified that he needed money "for my benefit also." There was evidence that law enforcement authorities in Connecticut were looking for Manns and that he had sold most of his home furniture.

[8] On direct examination of Pina by defense counsel, and with reference to about the first seven months of 1981, the following took place:

"Q. Did [Manns] have a ready supply of heroin and cocaine?

"A. He was one of the biggest ones I seen and I have been doing dope for twenty years, and he was one of the biggest in New Britain in twenty years. I have seen no bigger.

"Q. Did his transactions involve thousands and thousands of dollars?

"A. I would say Marc [Manns] made close to three-quarters of a million within a period of maybe seven months, eight months.

"Q. Was he known to be the biggest drug dealer in New Britain?

"A. One of the biggest, I would say, in twenty years. I seen guys go to New York, buy a little, make a little money and then they would quit. Like I said, Marc—I went to New York with Marc. I been in Harlem with Marc

Manns made "way over" $5000 a day in drug traffick-ing and that he made "close to three-quarters of a mil-lion [dollars] within a period of maybe seven months, eight months." Pina also testified that Manns sold drugs to Almeida and Dillard, his companions in the jewelry store robberies. In addition, Pina testified that Manns frequently used cocaine.

The defendant also introduced the testimony of Eric Baldwin, who stated that Manns used to sell and use drugs. He said that during 1981 Manns was "the big-gest [dope dealer] in New Britain" and that Manns was considered a "liar." Baldwin also testified that Manns supplied drugs to both Almeida and Dillard.

The state, in an attempt to rebut the testimony of the defendant's witnesses concerning Manns' drug dealings, called Trooper Angelo Tosi of the Connecti-cut state police. Tosi testified that he had been a state trooper for over seventeen years and that his present assignment was as "the Intelligence Officer of the [Statewide Narcotics] Task Force." He had been the intelligence officer for five years at the time of trial. He had spent approximately sixteen years of his seven-teen years actively involved in narcotics investigation.

---

and I have been there. I seen. I've seen tables as big as the table at that State Attorney's table full of dope with five or six people packaging dope."

On cross-examination of Pina, the following took place:

"Q. You said Manns was the biggest drug dealer in New Britain?

"A. Like I said, the biggest I seen in twenty years.

"Q. He made five thousand dollars a day dealing drugs?

"A. I would say he made more.

"Q. How much would you say?

"A. He had to make real good—I mean, way over five thousand, sir.

"Q. Way over five? Way over how much?

"A. Way over five thousand. I mean, I know drug addicts that was spend-ing money like I was spending—if they were spending two hundred dollars a day and there is over thirty drug addicts in New Britain that I know of and they were doing just as much dealings and catching cases just like I was."

The state elicited from Tosi a detailed description of his employment duties and functions. Tosi testified that he received both documented and undocumented intelligence information.[9] Tosi described the nature and type of sources for the two types of information that he received. He specifically stated that he had sources or informants, documented and undocumented, who gave him information from the city of New Britain.

In response to the state's inquiry, Tosi stated that he would classify a heroin dealer who does $5000 worth of business a day as a "major heroin trafficker and by this I mean an individual who is in the top echelon of narcotic trafficking in Connecticut." Expanding upon this line of questioning, the state then asked: "Based on your training and experience, do you have an opinion as to whether or not a heroin dealer who operates at that level can operate at that level for a period of two or three months without your receiving some intelligence information about him?" The defendant objected to this question, claiming that there was no foundation for it and that it was a "question which could be answered many, many ways and calls for a conclusion on his part." The state argued that it was the defense who had brought into the case that Manns was a heroin dealer doing in excess of $5000 a day. The objection was overruled, an exception was taken[10] and Tosi answered, "Highly unlikely."

---

[9] Tosi testified that documented information is "information that we can back up and substantiate through active investigations about either a particular individual, a particular organization, a ring of people that are involved in the trafficking of narcotics." He testified that undocumented information is "information from the field that a particular individual is involved in narcotic trafficking or a particular individual is involved in the use of narcotics."

[10] The record reveals that the defendant objected to the first question that was asked of Tosi by the state—whether in his opinion a high level drug trafficker could operate without his knowledge. The objection was overruled and an exception was taken. However, the next question the state asked Tosi, whether he had any information on Marc Manns of New Brit-

The state further asked Tosi if his intelligence files contained any information on Manns in New Britain. The question was not objected to by the defendant. Tosi answered, "Negative. I have no information whatsoever on that particular individual." The defendant claims error in the admission of the opinion testimony of Tosi and of his negative knowledge testimony, arguing that it was "extremely damaging" to his claim, presented through Baldwin and Pina, that Manns was "a major heroin dealer."

The defendant first claims that there were "glaring and severe" deficiencies in the foundation that was laid by the state for Tosi's expert testimony. "Whether a witness is qualified to testify as an expert is a matter largely within the trial court's discretion." *State* v. *Wallace,* 181 Conn. 237, 241, 435 A.2d 20 (1980); *Oborski* v. *New Haven Gas Co.,* 151 Conn. 274, 280, 197 A.2d 73 (1964). " '[U]nless that discretion has been abused or the error is clear and involves a misconception of the law,' " its ruling will not be disturbed. (Citation omitted.) *Going* v. *Pagani,* 172 Conn. 29, 35, 372 A.2d 516 (1976).

"The true test for the admissibility of expert testimony is 'whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue.' " *Schomer* v. *Shilepsky,* 169 Conn. 186, 191, 363 A.2d 128 (1975), quoting *Taylor* v. *Monroe,* 43 Conn. 36, 44 (1875); see

ain, was not objected to by the defendant. The state argued that an inquiry into the admissibility of this testimony was not an issue properly preserved on this appeal because the first objection was not a continuing objection. Nevertheless, the defendant's objection to "the whole line of questioning," a "continuing objection" which the trial court seemed to permit, is sufficient in this narrow context to preserve it for review on this appeal. *State* v. *Jackson,* 3 Conn. App. 132, 485 A.2d 934 (1985), is not apposite on the facts before us.

*State* v. *Palmer,* 196 Conn. 157, 166, 491 A.2d 1075 (1985); 7 Wigmore, Evidence (Chadbourn Rev. 1978) § 1923. "The test for admissibility is not limited to matters of scientific knowledge." *State* v. *Palmer,* supra, 191.[11] "In any event, if reasonable qualifications are established, objections go only to the weight to be given to the witness' opinion rather than to its admissibility." *State* v. *Wallace,* supra, 241; *Oborski* v. *New Haven Gas Co.,* supra, 280.

The record reveals that Tosi had in-depth knowledge of narcotics trafficking in Connecticut. He had "peculiar . . . experience, not common to the world"; *Taylor* v. *Monroe,* supra; that could aid the jury in determining a disputed theory in the trial—whether Manns used and sold drugs on the scale claimed. Tosi had acquired personal knowledge of the subject of his testimony from his sixteen years' experience as a narcotics investigator. In addition, he was in a superior position, as the intelligence officer of the statewide narcotics task force, to gain expertise and experience in his field of specialty. That background, experience and training was sufficient to support Tosi's qualifications as an expert.

The defendant argues that the trial court erred in the admission of Tosi's "negative knowledge" opinion. There was an adequate foundation for Tosi's opinion.

[11] For example, in the criminal context we have allowed a police officer to testify as an expert concerning the significance and meaning of markings on gambling policy slips; *State* v. *DelVecchio,* 145 Conn. 549, 553, 145 A.2d 199 (1958); see also *State* v. *Johnson,* 140 Conn. 560, 563, 102 A.2d 359 (1954); a police sketch artist to give his opinion with respect to the similarities and dissimilarities of the spatial features of the person depicted in the composite sketch he made to a photograph of the defendant, as well as a similar opinion with respect to the composite sketch and the defendant in the courtroom; *State* v. *Palmer,* 196 Conn. 157, 165–67, 491 A.2d 1075 (1985); the manner in which heroin was transported; *State* v. *Grayton,* 163 Conn. 104, 111, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972); and on the habits of narcotics users. *State* v. *Williams,* 169 Conn. 322, 334, 363 A.2d 72 (1975).

"It is well settled that negative testimony is admissible where the attending circumstances are such as to show that it has some probative force, provided the competency of the witness and his knowledge of the matter of which he speaks are established." 29 Am. Jur. 2d, Evidence § 258. Wigmore states that the only requirement for the use of negative knowledge testimony is that "the witness should have been so situated that *in the ordinary course of events he would have heard* or seen the fact had it occurred." (Emphasis in original.) 2 Wigmore, Evidence (3d Ed. 1940) § 664. The competency of Tosi and his extensive knowledge of drug operations in Connecticut were sufficient to infuse his "negative knowledge" testimony with probative force. Tosi's job placed him in a situation to receive and analyze extensive information that would include possible data on Marc Manns as a drug trafficker. The fact that Tosi's search of his files did not reveal Manns to be a drug trafficker was not admitted as evidence of the defendant's guilt but rather to prove the nonexistence of any drug activity of Manns. Tosi's "highly unlikely" statement was admissible as some evidence on the disputed subject of Manns as a drug trafficker in New Britain.

Moreover, the defendant's extensive cross-examination of Tosi served to explore thoroughly the scope and nature of the informational data available to Tosi. The defendant fully exercised his right to cross-examine Tosi and therefore to expose to the fact-finder any weaknesses in his testimony on direct examination. The defendant's claim of prejudice from the admission of Tosi's testimony lacks merit, and he has not sustained his burden of demonstrating prejudice on this nonconstitutional claim. Mann's testimony, which the jury appears to have credited, while key, was not the only significant evidence against the defendant. For example, the testimony of Esther Johnson, Manns' alleged

girlfriend, corroborated his testimony in several important respects during her extensive examination, which constituted almost one day at the trial. The testimony of Tosi, which was properly admitted, had nothing to do with the actual guilt or innocence of the defendant but instead concerned the credibility of Manns as attacked by the defense, particularly through the witnesses Pina and Baldwin. Tosi's testimony thus went to credibility in a trial in which a crucial issue was the credibility not only of these witnesses but also of other witnesses produced by both the state as well as the defense. Moreover, the state adduced evidence that, if believed, constituted a strong case against the defendant. The trial judge, at the time of sentencing, said that the evidence appeared to have been "overwhelming." In admitting Tosi's expert testimony, the court's ruling neither abused its wide discretion nor involved a misconception of the law. *State* v. *Palmer,* supra, 166; see *State* v. *Briggs,* 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980).

Finally, the defendant claims that he did not receive effective assistance of counsel. Although conceding that "claims of ineffective assistance of counsel can seldom if ever be properly considered on direct appeal," he asserts this claim on direct appeal "in order to avoid a later claim of 'deliberate bypass.'"

An ineffective assistance of counsel claim requires the defendant to make a two-component showing: "that trial counsel's performance was not reasonably competent or within the range of ordinary training and skill in the criminal law, and that trial counsel's lack of competence contributed to the defendant's conviction." (Citations omitted.) *State* v. *Rivera,* 196 Conn. 567, 570, 494 A.2d 570 (1985); see also *Levine* v. *Manson,* 195 Conn. 636, 640, 490 A.2d 82 (1985); *Williams* v. *Manson,* 195 Conn. 561, 564, 489 A.2d 377 (1985). The

record on direct appeal, of course, "rarely reveals the strategic reasons" underlying the trial tactics taken by defense counsel. *State* v. *Rivera*, supra; see also *State* v. *Tirado*, 194 Conn. 89, 92, 478 A.2d 606 (1984). That applies here. As we have recently stated: "When the claim of inadequate counsel is joined with other substantive and procedural claims of error, it is often difficult to make a judgment about the extent to which inadequate counsel has implicated the outcome of the criminal conviction. For that reason, it will ordinarily be necessary to await exhaustion of the direct appeal before the claim of ineffective assistance can be pursued on a petition for habeas corpus." *State* v. *Rivera*, supra, 571 n.1.

In this case (Docket No. 11622), the defendant cites eleven instances of trial conduct, most of which have no relation to his claim on direct appeal, that support his ineffective assistance of counsel claim. Thus, although the defendant properly joined all his claims of error together in this appeal, we decline to address this claim on direct appeal; it is for the defendant to decide if he wishes to pursue his ineffective assistance of counsel claim in an appropriate collateral action.

There is error on the defendant's appeal in the first case (Docket No. 12342), the judgment is set aside and a new trial is ordered.

There is no error on the defendant's appeal in the second case (Docket No. 11622).

In this opinion the other judges concurred.