STATE OF CONNECTICUT *v.* LLOYD A. SATCHWELL
(SC 15541)

Borden, Katz, Palmer, McDonald and Peters, Js.

Argued December 10, 1997—officially released April 28, 1998

*Neal Cone*, assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, deputy assistant state's attorney, with whom was *John A. Connelly*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Following a jury trial, the defendant, Lloyd Satchwell, was convicted of four counts of arson murder in violation of General Statutes § 53a-54d,[1] and one count each of first degree arson in violation of General Statutes § 53a-111 (a) (1)[2] and conspiracy to commit first degree arson in violation of General Statutes §§ 53a-48 (a)[3] and 53a-111 (a) (1). The trial court rendered judgment sentencing the defendant to a total effective sentence of 120 years imprisonment with no possibility of parole. The defendant appealed from the judgment of the trial court to this court pursuant to General Statutes (Rev. to 1997) § 51-199 (b) (3).[4] On

[1] General Statutes § 53a-54d provides: "Arson murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits arson and, in the course of such arson, causes the death of a person. Notwithstanding any other provision of the general statutes, any person convicted of murder under this section shall be punished by life imprisonment and shall not be eligible for parole."

[2] General Statutes § 53a-111 provides in relevant part: "Arson in the first degree: Class A felony. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building . . . he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] General Statutes (Rev. to 1997) § 51-199 (b) provides in relevant part: "The following matters may be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ." Public Acts 1997, No.

appeal, the defendant claims that he is entitled to a new trial: (1) due to alleged misconduct by the state's attorney; and (2) because the trial court permitted the state to introduce into evidence a videotape of the crime scene and slide photographs of the deceased victims, the prejudicial effect of which, he maintains, outweighed their probative value. We reject these claims and, consequently, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant's wife, Esmay Notice, owned a three story duplex located at 85 Crescent Street in Waterbury.[5] At all times relevant to this appeal, two families occupied separate apartments in the duplex: (1) Clarence Winston, Sr., and Barbara Winston, their three children, Tiana, Clarence, Jr., and Tarley, and Tiana's two children, three year old Tiana and eighteen month old Jostin; and (2) Dwayne Wilson and Laurie Mercer, and their six children.

In early 1993, Notice became upset with Wilson and Mercer because they were not making timely rental payments. Notice also was angry with the defendant because he had been collecting rent from the Winstons and not turning it over to Notice. Due to the difficulty that Notice was having in obtaining the rental payments, she was obliged to use her own savings to make the mortgage payments on the duplex. Unhappy with the situation, Notice resolved to have the duplex burned down in order to have it "out of [her] way," and to collect the proceeds of the insurance policy on the property.[6]

97-178, § 2, amended § 51-199 (b) (3) to eliminate the right of direct appeal from all criminal convictions except conviction of a capital felony, effective October 1, 1997.

[5] The duplex was listed in the records of the Waterbury tax assessor's office as being owned jointly by Notice and her cousin, Stanford Davis.

[6] Notice had purchased the duplex in 1989 for $199,000. Two years later, in anticipation of selling the property, Notice had obtained an appraisal which revealed that the market value of the duplex had declined to $120,000. The duplex, however, was insured for approximately $210,000.

In late April or early May, 1993, Notice sought the assistance of an acquaintance, Valerie Evans, in locating someone who would be willing to set fire to the duplex. In return for Evans' help, Notice promised Evans, who was unemployed, that she "would never [again] be out of work." Evans agreed to introduce Notice to Donnie Burton, who, Evans thought, might agree to set fire to the building.

Several days later, Evans introduced Notice to Burton. Notice explained to Burton that she was looking for someone to set fire to a house, and she offered Burton cash and crack cocaine if he would do it. When Burton asked whether the home was occupied, Notice responded that the tenants had been evicted. Notice also told Burton that the defendant would meet with Burton later that day.

That evening, the defendant and Evans met with Burton. The defendant asked Burton whether he "knew what was going on, if [Notice had] spoke[n] to [him] already." Burton responded affirmatively, and the defendant told Burton that he would be notified when it was time for him to "do the job."

Soon thereafter, Notice telephoned Evans, gave Evans the address of the duplex, and informed Evans that she was "ready to have the [duplex] burned down." The next day, Notice and Evans again met with Burton. Notice told Burton that she wanted the duplex burned "down to the ground" by the end of the month, and reassured him that she would make it worth his while. Burton, however, was noncommittal.

A short time later, Burton, concerned that the duplex might be occupied, proceeded to the address provided to him by Notice. Observing lights on inside the duplex and a leashed dog and a parked car outside, Burton

concluded that the building was occupied. For that reason, Burton decided not to be involved in the plan to burn down the duplex.

Upon learning of Burton's decision, the defendant told Notice that he would set fire to the building. In preparation for doing so, the defendant obtained two one-gallon plastic containers and filled them with gasoline. The defendant also secured a homemade timing device that had been constructed from a "Jello" gelatin box and a book of matches. The defendant explained to Notice that he intended to use the device, along with a lit cigarette, to ignite the gasoline, which he planned to use as an accelerant.[7]

Notice went to bed at approximately 10 p.m. on May 30, 1993. The defendant, who had been visiting a friend that evening, returned home between midnight and 1 a.m., awakened Notice, and informed her that he was going back out to burn down the duplex. Notice then went back to sleep.

The defendant returned shortly and informed Notice that he had poured gasoline on the front steps of the duplex and ignited it. Notice detected a slight odor of gasoline on the defendant, who showered and went to bed.

At approximately 3 a.m. on May 31, Wilson and Mercer, awakened by their intercom buzzer, proceeded to the first floor of the duplex and observed the front porch ablaze. Wilson and Mercer escaped through a

---

[7] The state adduced testimony from members of the Waterbury fire marshal's office regarding the use of such a timing device, which, according to one of the state's witnesses, frequently is used in connection with arson fires. Another state's witness explained that the gelatin box shields the burning cigarette from the accelerant. Once the cigarette has burned down, however, it ignites the matches, which, in turn, ignite the accelerant. Generally, all that remains of the device at an arson scene is a staple from the matchbook and the filter portion of the cigarette.

rear door of the building with their children. Upon learn-ing of the fire, Clarence Winston, Jr., and Tarley Winston also managed to escape through a rear exit, and Tiana Winston, their sister, jumped to safety from a rear sec-ond floor porch. Clarence Winston, Sr., and Barbara Winston, who, along with their granddaughter Tiana, were observed on the roof of the front second floor porch, refused to jump and, instead, reentered the duplex.

By the time members of the Waterbury fire depart-ment arrived, flames were visible in all of the windows of the duplex, and the intensity of the fire prevented the firefighters from entering the building. When they finally were able to gain entrance into the duplex, fire-fighters found the remains of Clarence Winston, Sr., Barbara Winston, and their two grandchildren, Tiana and Jostin.

At approximately 6 a.m. on May 31, Notice received a telephone call from a former tenant notifying her of the fire. Notice awakened the defendant, and they went outside to Notice's car. The defendant removed the two plastic containers from the car and placed them in a toolshed next to the garage. He also retrieved the timing device from the car's trunk, but inadvertently dropped the device on his way to the toolshed. The defendant and Notice thereafter drove to the duplex, informed the Waterbury police that they were the building's landlords and, at the request of the police, voluntarily proceeded to the police station, where they were questioned sepa-rately. Notice provided the police with a sworn state-ment implicating the defendant in the fire.

Later that morning, Waterbury police officers, accom-panied by Notice, executed a search warrant at the home where she and the defendant resided. The police seized numerous articles of clothing and other items of personal property from the residence. The police also

retrieved the two plastic containers from the toolshed, along with the homemade timing device that the defendant accidentally had left in his yard earlier that morning. Tests conducted by the state forensic laboratory detected the presence of gasoline in the two plastic containers and on a pair of men's black slacks seized from the defendant's residence.[8]

The police also obtained a search warrant for Notice's car. Upon executing the warrant, the police detected a heavy odor of gasoline inside the vehicle. In addition, the floor mat and a piece of carpet retrieved from the front passenger side of the car tested positive for gasoline. Finally, the state tested wood samples taken from the front steps and porch of the duplex. These tests also revealed the presence of gasoline.

On the basis of his review of the fire scene and the evidence collected by the police, Waterbury fire marshal Anthony Zappone concluded that the fire had been set deliberately, and that it had spread from the front porch of the duplex, where an accelerant had been used, to the rear of the building. Autopsies performed on the four victims revealed that they had died of smoke inhalation.

Both Notice and the defendant were arrested and charged in connection with the arson. Prior to trial, Notice pleaded guilty to one count of aiding and abetting first degree arson in violation of General Statutes §§ 53a-8[9] and 53a-111 (a) (1), and to one count of conspiracy to commit first degree arson in violation of

[8] Cynthia Liggins, a longtime friend of the defendant, testified that he had visited her at her apartment on May 30, 1993, between 10 and 11 p.m., and that at that time, he was wearing black slacks.

[9] General Statutes § 53a-8 provides in relevant part: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

General Statutes §§ 53a-48 (a) and 53a-111 (a) (1). After the conclusion of the defendant's trial, Notice, who had been the state's key witness against the defendant, was sentenced to a term of imprisonment of twenty-five years for her involvement in the arson.[10] Additional facts will be set forth as necessary.

## I

The defendant raises four claims of prosecutorial misconduct, each of which, he contends, deprived him of a fair trial in violation of his due process rights under the state and federal constitutions.[11] Specifically, the defendant asserts that the state's attorney improperly: (1) failed to disclose the full extent of the promise made by the state to Notice in return for her agreement to cooperate against the defendant; (2) vouched for Notice's credibility; (3) referred to evidence that previously had been ruled inadmissible; and (4) commented on the defendant's failure to testify. To the extent that the defendant did not preserve these claims properly at trial, he seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[12] Alternatively, the

[10] Under the terms of Notice's plea agreement with the state, the maximum term of imprisonment that she faced was forty years. At the sentencing hearing, the state's attorney informed the court that Notice had provided "crucial" testimony against the defendant, but he made no specific sentencing recommendation to the court.

[11] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[12] Under *State* v. *Golding*, supra, 213 Conn. 239–40, a defendant may prevail only if all of the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

defendant seeks a new trial under the plain error doctrine; see Practice Book § 4061, now Practice Book (1998 Rev.) § 60-5; or in the exercise of our supervisory authority over the administration of justice.[13] For the reasons that follow, we reject each of the defendant's claims.

A

The defendant first maintains that the state's attorney misrepresented the true nature of Notice's plea bargain with the state by failing to reveal that the state had promised to reduce the charges against Notice in return for her agreement to cooperate against the defendant. We conclude that the record is inadequate for our review of this claim.

The following additional facts are relevant to our resolution of this claim. On June 1, 1993, the state filed an information charging Notice with conspiracy to commit first degree arson. On July 8, 1993, the state filed a substitute information charging Notice with four counts of arson murder, one count of first degree arson, and one count of conspiracy to commit first degree arson. On August 20, 1993, the state filed a second substitute information charging Notice with four counts of aiding and abetting arson murder, one count of first degree arson, and one count of conspiracy to commit first degree arson. Finally, on July 23, 1995, the state filed a third substitute information charging Notice with one count of aiding and abetting arson in the first degree

---

[13] Under the plain error doctrine, we may reverse a criminal conviction when prosecutorial misconduct has "so pervade[d] the defendant's trial as to have impaired the effectiveness or integrity of the judicial process." *State* v. *Atkinson*, 235 Conn. 748, 769, 670 A.2d 276 (1996). Under our supervisory authority, we may "vacate a judgment of conviction and . . . order a new trial to deter prosecutorial misconduct which, while not so egregious as to deprive the defendant of a fair trial, is unduly offensive to the maintenance of a sound judicial process." (Internal quotation marks omitted.) *State* v. *Fullwood*, 194 Conn. 573, 584, 484 A.2d 435 (1984).

and one count of conspiracy to commit arson in the first degree. On August 10, 1995, Notice pleaded guilty to the arson and conspiracy charges contained in the third substitute information. Jury selection in the defendant's case commenced on January 31, 1996.

Testifying for the state against the defendant, Notice acknowledged that she had pleaded guilty to one count of aiding and abetting first degree arson and to one count of conspiracy to commit first degree arson. Notice further indicated that the state's attorney, in exchange for her agreement to testify against the defendant, had assured Notice that the state would inform the sentencing judge of her cooperation. Notice also expressed her understanding that, under the terms of her plea agreement with the state, she faced a term of imprisonment of between twenty-five and forty years. In addition, Notice recalled with some difficulty that, at one time, she had been charged with aiding and abetting arson murder, although she testified that she was not aware of the penalty for that offense. Notice also testified that she did not remember whether any charges had been dismissed as a result of her guilty plea and cooperation, nor did she know whether the charges against her for aiding and abetting arson murder had been dismissed.

The defendant also sought to introduce into evidence the original information and the three substitute informations that the state had filed against Notice, along with a redacted transcript of the hearing at which Notice had pleaded guilty.[14] The defendant claimed that this evidence was relevant because it tended to establish that Notice had agreed to cooperate with the state in return for the state's promise to dismiss the four counts

---

[14] The redacted transcript corroborated Notice's testimony with respect to the charges to which she had pleaded guilty, the nature of her agreement with the state, and the maximum term of imprisonment that she faced under the agreement.

of aiding and abetting arson murder, each of which carried a possible maximum penalty of life imprisonment without the possibility of parole, and to allow her to plead guilty to one count of aiding and abetting first degree arson and one count of conspiracy to commit first degree arson, each of which is punishable by a prison term of not less than ten years nor more than twenty-five years.[15] See General Statutes § 53a-35a. The state's attorney objected to the defendant's proffer, expressly denying that he had agreed to dismiss the aiding and abetting arson murder charges in exchange for Notice's cooperation. He represented, instead, that Notice had been allowed to plead guilty to the lesser offenses set forth in the third substitute information due to difficulties that the state would have had in proving the more serious arson murder charges.[16] The trial court, however, overruled the state's objection, and the original information, the three substitute informations, and the redacted transcript of Notice's guilty plea all were introduced into evidence.

The defendant also presented the testimony of Walter Scanlon, a retired former criminal defense attorney and assistant state's attorney, who explained that a prosecutor retains discretion with respect to which charge or charges to file against a defendant. Scanlon confirmed that arson murder carries a maximum term of imprisonment of life without the possibility of parole. On cross-examination by the state's attorney, Scanlon testified

[15] In support of his claim of admissibility, defense counsel stated that "through this evidence I'm trying to show that [Notice] had an interest in testifying and the interest was that she would escape mandatory life imprisonment by pleading to the lesser charges and cooperating with the state." Thereafter, defense counsel apprised the court that he also was seeking to persuade the jury that the circumstances surrounding Notice's guilty plea indicated that the state's attorney had agreed to allow Notice to plead guilty to the lesser charges in return for her cooperation against the defendant.

[16] The state's attorney suggested that the state's difficulty in proving the aiding and abetting arson murder charges stemmed from certain unspecified "legal technicalities."

that substitute informations are filed in many, "maybe even most," cases, and for a variety of reasons. Scanlon indicated that, among other reasons, a prosecutor may file a substitute information deleting a particular charge or charges when it has been determined, after further investigation by the state, that the original charge or charges are not legally or factually supportable.[17]

The state's attorney, in his closing argument to the jury, reminded the jurors of Scanlon's testimony concerning the multitude of factors that may motivate a prosecutor to file a substitute information, and suggested that Notice's confusion over the charges that originally had been filed against her most likely was attributable to language difficulties. Defense counsel, in his closing argument, countered by questioning Notice's motivation for testifying. In particular, he suggested that Notice had agreed to testify against the defendant because the state had agreed to dismiss the four counts of aiding and abetting arson murder.[18] In his rebuttal

---

[17] We note that the state's attorney, during his cross-examination of Scanlon, questioned Scanlon regarding *State* v. *Beccia*, 199 Conn. 1, 505 A.2d 683 (1986) (because person cannot intend to commit reckless act, conspiracy to commit arson in third degree is not crime cognizable under state law), *State* v. *Valeriano*, 191 Conn. 659, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984) (rejecting defendant's argument that statutory language of felony murder statute requiring that death occur "in furtherance of" felony requires state to prove that accused must have intended to cause death), and *State* v. *Young*, 191 Conn. 636, 469 A.2d 1189 (1983) (same). The state's attorney withdrew his question regarding *Beccia*, however, and Scanlon indicated that he was not sufficiently familiar with either *Valeriano* or *Young* to comment on them. At no time did the state's attorney expressly indicate what relevance, if any, the holdings of these cases may have had with respect to the state's decision to dismiss the four counts of aiding and abetting arson murder against Notice.

[18] The relevant portion of defense counsel's argument was as follows: "There's only one issue here, only one issue. Was Esmay Notice so believable that you can beyond a reasonable doubt believe what she says about [the defendant]? If you cannot do that, you cannot convict [the defendant].

"I introduced a couple of things for you to look at at your leisure when you have the opportunity to have all the exhibits with you. And one of them, of course, is a transcript of a portion of the plea that [Notice] took. You

argument, the state's attorney again indicated that the state's decision to dismiss those counts had not been part of any "deal" between the state and Notice.

On appeal, the defendant contends that the state, notwithstanding the state's attorney's representations to the contrary, had entered into an improper secret deal with Notice pursuant to which the state's attorney had agreed to reduce the charges against Notice in exchange for her cooperation against the defendant. The defendant further claims that, in light of the alleged secret agreement, the state's attorney improperly: (1) failed to contradict Notice's testimony concerning the terms of her plea agreement; and (2) argued to the jury that the evidence failed to establish that the aiding and abetting arson murder charges were dismissed as part of Notice's plea agreement with the state.

"The defendant asserts that [this] scenario results in constitutional error under *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), since the knowing presentation of false evidence by the state is incompatible with the rudimentary demands of justice. *Giglio* v. *United States*, supra, 153 . . . . Furthermore, due process is similarly offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. *Napue* v. *Illinois*, supra, 269. If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the

---

can read it to yourself. You can see what it says yourself. And again you brought your common sense with you. You can decide what it means. You don't need expert help. For almost two years Esmay Notice was charged with four counts of aiding and abetting arson murder. Each count carries life in prison. Those counts get dropped. She agrees to testify and then she pleads guilty. No longer facing the charges or the sentence that she previously faced. Is she looking out for the interests of justice or her own self-interests again? Common sense applies. We don't need expert witnesses and I don't think you do either."

inducement, the state is obliged to correct the misconception. *Giglio* v. *United States*, supra [153]; *Napue* v. *Illinois*, supra, 269–70. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. *United States* v. *Harris*, 498 F.2d 1164, 1169 (3d Cir.), cert. denied sub nom. *Young* v. *United States*, 419 U.S. 1069, 95 S. Ct. 655, 42 L. Ed. 2d 665 (1974). A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. *Napue* [v. *Illinois*], supra, 271. *Giglio* v. *United States*, supra, 154; see *United States* v. *Bagley*, 473 U.S. 667, 678–80, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)." (Citation omitted; internal quotation marks omitted.) *State* v. *Paradise*, 213 Conn. 388, 399–400, 567 A.2d 1221 (1990); see *Mills* v. *Scully*, 826 F.2d 1192, 1195–96 (2d Cir. 1987); *DuBose* v. *Lefevre*, 619 F.2d 973, 978 (2d Cir. 1980).

The defendant, however, has failed to establish the necessary factual predicate to his claim, namely, that the state's attorney did, in fact, promise to dismiss the aiding and abetting arson murder charges against Notice as part of the plea agreement between Notice and the state. Cf. *Giglio* v. *United States*, supra, 405 U.S. 153 (prosecutor who had promised witness he would not be prosecuted if he testified improperly failed to correct witness' contradictory trial testimony and, during closing argument, improperly denied that any promises had been made to witness); *Napue* v. *Illinois*, supra, 360 U.S. 270–71 (prosecutor who had promised witness he would recommend sentence reduction as consideration for agreement to testify improperly failed to correct witness' contradictory trial testimony). Although the defendant presented evidence from which the *jury* might have inferred the existence of the alleged secret promise, the defendant, for reasons of strategy

or otherwise, never sought a determination by the *court* regarding the existence of such a promise.[19] Because it is the function of the trial court, not this court, to resolve disputed factual issues; see, e.g., *State* v. *Cobb*, 234 Conn. 735, 750, 663 A.2d 948 (1995); *State* v. *Pollitt*, 199 Conn. 399, 415, 508 A.2d 1 (1986); *State* v. *Lafferty*, 189 Conn. 360, 363, 456 A.2d 272 (1983); the defendant was required to seek a determination by the trial court of his fact-based claim of an undisclosed agreement between Notice and the state. Since the defendant never did so, the record contains no findings to support his assertion. The record, therefore, is inadequate for our review of the defendant's claim.

The defendant nevertheless contends that the only inference plausibly to be drawn from the record is that the state agreed to dismiss the aiding and abetting arson murder charges against Notice in exchange for her testimony. In particular, the defendant challenges as unfounded the state's attorney's assertion that he had dismissed those charges because the state would have had difficulty in proving them. The defendant claims that, because the crime of aiding and abetting arson murder contains only one element that is not also an element of the crime of first degree arson, namely, that a death resulted from the arson, the state's attorney's reason for dismissing the aiding and abetting arson murder charges must be viewed as pretextual.[20]

---

[19] We note that the defendant could have adduced testimony from Notice's counsel as to the existence of any such agreement between Notice and the state. Indeed, the state's attorney expressly suggested that the defendant "call [Notice's attorney]" to testify about the nature of the agreement between Notice and the state. The defendant, however, elected not to do so.

[20] In support of his claim of a secret agreement, the defendant also relies upon a statement made by the state's attorney at Notice's sentencing hearing indicating that the state had "allowed" Notice to plead guilty to the lesser charges. Contrary to the defendant's assertion, this statement by the prosecutor sheds no light as to *why* the state allowed Notice to plead guilty to the lesser offenses.

Although we agree with the defendant's analysis of the elements of the crimes of arson murder and first degree arson, we will not lightly presume that the state's attorney misrepresented the true nature of the state's agreement with Notice. In view of the inadequacy of the record, we are unable to determine precisely what facts or circumstances, wholly apart from any agreement with Notice, may have prompted the state's attorney to dismiss the four charges of aiding and abetting arson murder against Notice. Nor will we speculate as to what factors the state's attorney legitimately may have considered in reaching his decision to dismiss those charges. We therefore reject the defendant's claim that the record compels a conclusion that the state's attorney secretly promised Notice that he would reduce the charges against her in return for her cooperation against the defendant.[21]

## B

The defendant next claims that the state's attorney improperly vouched for Notice's credibility on two separate occasions during his rebuttal closing argument, thereby entitling the defendant to a new trial. We disagree.

The following additional facts are necessary to our resolution of this claim. At the beginning of his rebuttal closing argument, the state's attorney, in addressing the defendant's argument that Notice had received favorable treatment from the state in return for her cooperation against the defendant, made reference to "[t]his big conspiracy, I guess, between me and Esmay Notice."

---

[21] We intimate no view as to whether the claimed secret promise, even if proven, would " 'in any reasonable likelihood have affected the judgment of the jury.' " *State* v. *Paradise*, supra, 213 Conn. 400. We note, however, that the jury was made aware of Notice's potential bias by Notice's own testimony that the state's attorney had assured her that her cooperation with the state would be brought to the attention of the sentencing judge. See footnote 10 of this opinion.

The trial court sustained the defendant's objection to the state's attorney's comment, but the defendant did not seek a curative instruction. Later, toward the end of his rebuttal argument, the state's attorney stated: "[Defense counsel] wants you to believe that I made a deal with the murderers—with the murderer of Clarence Winston [Sr.], Barbara Winston, Jostin Winston and Tiana Winston. He wants you to believe that I made a deal with the murderer of Clarence, Tarley and Tiana's parents. He wants you to think that I made a deal with the murderer of Tiana and Jostin Winston. He wants you to believe that I made a deal with the murderer of those people's parents and that woman's children. No way. No way." Defense counsel failed to object to these remarks.

"We have previously acknowledged that prosecutorial misconduct can occur in the course of closing argument." *State* v. *Atkinson*, 235 Conn. 748, 768–69, 670 A.2d 276 (1996). Furthermore, it is improper for a prosecutor to express his or her own opinion, either directly or indirectly, as to the credibility of witnesses. *State* v. *Hammond*, 221 Conn. 264, 289, 604 A.2d 793 (1992); *State* v. *Williams*, 204 Conn. 523, 541, 529 A.2d 653 (1987). It is well settled, however, that a defendant may not prevail under *Golding* or the plain error doctrine unless the prosecutorial impropriety was so pervasive or egregious as to constitute an infringement of the defendant's right to a fair trial, nor will we invoke our supervisory authority to reverse an otherwise lawful criminal conviction absent a showing that the conduct of the prosecutor was so offensive to the judicial process that a new trial is necessary to deter such misconduct in the future. See footnotes 12 and 13 of this opinion. Finally, we must review the challenged comments in the context of the entire trial, with due regard to the extent to which the objectionable remarks were

invited by defense conduct or argument. *State* v. *Williams*, 231 Conn. 235, 246–47, 645 A.2d 999 (1994); *State* v. *Richardson*, 214 Conn. 752, 759–60, 574 A.2d 182 (1990).

With respect to the defendant's first claim of impropriety, the trial court properly sustained the defendant's objection to the state's attorney's use of the term "conspiracy," which was uttered only once and not repeated. In such circumstances, we are not persuaded that the state's attorney's characterization of the defendant's claim so tainted the proceedings as to deprive the defendant of a fair trial. Nor was the state's attorney's isolated use of the word "conspiracy" so inflammatory or offensive as to warrant reversal of the defendant's conviction in the exercise of our supervisory authority.

We reach the same conclusion with respect to the defendant's second and related claim of prosecutorial misconduct, namely, that the state's attorney impermissibly vouched for Notice's credibility by personally denying that he had entered into a secret agreement with Notice. The state's attorney's argument denying that he secretly had promised to reduce the charges against Notice was made in response to the defendant's suggestion that the state's attorney had, in fact, entered into such an agreement. Moreover, the defendant's failure to object to the argument at the time it was made lends support to the state's contention that the remarks may be considered a fair response to the defendant's claim of a secret agreement between Notice and the state. See *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993) (defendant's failure to object to prosecutor's closing argument indicated that defendant did not regard argument as seriously prejudicial). Although the state's attorney, having chosen to respond to the defendant's claim, should have done so by reference to the evidence, or lack thereof, and not via a first person denial of the existence of a secret agreement;

see, e.g., *United States* v. *Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982) ("[a] prosecutor should exercise restraint to avoid needless personal references, without sacrificing the vigor or effectiveness of his argument"); we are not persuaded that the state's attorney's brief comments, when viewed in the context in which they were uttered, were unduly prejudicial to the defendant. Accordingly, we reject the defendant's contention that the state's attorney's remarks warrant a new trial.

C

The defendant next claims that he is entitled to a new trial because the state's attorney, in his rebuttal closing argument, improperly referred to evidence that the trial court previously had ruled inadmissible. We disagree.

The following additional facts are relevant to our disposition of this claim. During his case-in-chief, the defendant, over the state's objection, introduced into evidence a redacted transcript of the hearing on Notice's guilty plea for the purpose of establishing the terms and conditions of Notice's plea agreement with the state.[22] The state's attorney objected to the admission of the redacted plea transcript on relevancy

[22] In explaining the relevance of the redacted transcript of Notice's guilty plea proceedings, defense counsel stated: "I am going to offer it to show a number of things: First of all, what Ms. Notice pled guilty to, because she had difficulty remembering exactly what it was; number two, to show that there was a substitute information which was filed [with] the court on that date and that is reflected in the transcript to show exactly what it is that the judge indicated to Ms. Notice she faced as a result of her plea. There seemed to be some confusion there and the court's statement to Ms. Notice at the time outlining what the ramifications were is included, and also the comments by [the state's attorney] as to what would or would not be or might be the results of her cooperation in testifying against [the defendant] is outlined." The portion of the transcript of the plea proceeding that had been redacted related to statements by the state's attorney regarding the state's version of the offense, a version with which the defendant disagreed.

grounds. The state's attorney further argued that if the trial court were to overrule his objection to the transcript, then an unredacted transcript of the entire plea proceeding should be introduced into evidence. The trial court overruled the state's objection and allowed the defendant to introduce the redacted transcript into evidence.

During his rebuttal closing argument, the state's attorney made the following statement: "You know, [defense counsel] said 'well, read the transcript, read the transcript [of Notice's guilty plea proceeding].' I wish you could read the transcript. But you're not going to read what happened on August 10 when that plea was taken because [defense counsel] edited nine pages of that transcript. It was nine or eight or seven whatever, nine pages of that transcript he wants to give you. That doesn't have in there what I said." The trial court sustained the defendant's objection to the state's attorney's remarks and issued an immediate curative instruction.[23] The state's attorney then stated as follows: "I apologize. The last thing I meant to do or attempted to do was say [that defense counsel] did anything wrong. The point I was trying to make is that is an edited transcript. You heard when I cross-examined the court reporter regarding the contents of that transcript. The state's case has no excerpts, no evidence left out. That's right. There's one hundred . . . something pieces of evidence in [this case]. We didn't edit anything. We [gave] you all the witnesses who could give you any information about this case." The defendant did not object to the remarks made by the state's attorney in connection with his apology.

---

[23] The trial court stated: "[T]he objection is sustained. The jury will disregard the comments with respect to—there was no wrong-doing on the part of [defense counsel] in putting in the edited portion. That's been argued about and ruled on by the court. For that reason, you'll disregard any comments that would indicate otherwise about the transcript that's in evidence."

The defendant claims that the state's attorney's comments regarding the redacted transcript improperly suggested that the defendant had withheld important evidence from the jury. The defendant also maintains that the state's attorney implicitly vouched for Notice's credibility by implying that the redacted transcript pages would have supported her testimony.

"It is well established that [a] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury. . . . [B]y reason of his [or her] office, [a prosecutor] usually exercises great influence upon jurors. His [or her] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because [a prosecutor] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 810–11, 699 A.2d 901 (1997). Thus, "the privilege of counsel in addressing the jury . . . must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." (Internal quotation marks omitted.) Id., 811; see *State* v. *Prioleau*, 235 Conn. 274, 320, 664 A.2d 743 (1995).

We agree with the defendant that the challenged references to the redacted transcript pages were inappropriate. Moreover, the impropriety arguably was exacerbated when, in connection with his apology for his remarks, the state's attorney noted that the state, in contrast to the defendant, had provided the jury with all of the evidence relevant to its case. Having failed to persuade the trial court that the redacted portion of the transcript also should have been introduced into

evidence, the state was not free to suggest that the redacted transcript pages contained information that was relevant to the case.

The defendant, however, promptly objected to the state's attorney's remarks, and the trial court immediately instructed the jury to disregard them. The defendant made no claim at trial, and he makes no claim on appeal, that the cautionary instruction given to the jury was incomplete or otherwise defective. "[W]e have previously recognized that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks or questions can obviate any possible harm to the defendant." *State* v. *Cruz*, 212 Conn. 351, 365, 562 A.2d 1071 (1989); see *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). Moreover, the state's attorney promptly apologized for his comments, which apparently were not of sufficient concern to the defendant to cause him to seek a mistrial. Finally, the brief reference to the edited transcript made by the state's attorney in connection with his apology was not sufficiently provocative to prompt either an objection from the defendant or any further comment by the trial court. Under all of the circumstances, therefore, we are satisfied that the challenged remarks did not adversely affect the defendant's right to a fair trial. Furthermore, the defendant has failed to establish that the state's attorney's comments were so offensive to the judicial process as to require reversal of the defendant's convictions, nor has he demonstrated that the remarks were part of a pattern of prosecutorial misconduct for which a new trial is required.

### D

Finally, the defendant claims that the state's attorney, during his rebuttal closing argument, improperly commented on the defendant's failure to testify. We reject this claim also.

The following additional facts are relevant to our consideration of this issue. As discussed in part I C of this opinion, the state's attorney, in connection with his apology for suggesting that the defendant improperly had redacted the transcript of Notice's plea proceedings, stated, "We didn't edit anything. We [gave] you all the witnesses who could give you any information about this case." Shortly thereafter, the state's attorney, in seeking to underscore the state's difficulty in producing eyewitnesses to the crime of arson, stated as follows: "Arsons aren't committed at twelve o'clock in the afternoon on the green in Waterbury. Arsons are committed at three o'clock in the morning with helpless people who are sleeping. That's the kind of crime arson is. Arson is the crime of a coward. I can't tell you—I can't bring [Joanne] Slavin[24] here and say she saw [the defendant] run away because she was in her bed sleeping. I can't bring [Joseph] Daly[25] in. I can't bring the Winstons in. *I gave you everything I had. I didn't excerpt anything.*" (Emphasis added.) Although the defendant failed to object to any of these statements, he now claims that the state's attorney's argument improperly focused the jury's attention on the defendant's failure to testify in violation of his rights under the fifth amendment to the United States constitution.[26]

We recently have reiterated the legal principles relevant to our review of such a claim. "It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. *Griffin*

[24] Joanne Slavin, a witness who testified for the state, resided at 86 Crescent Street, directly across the street from the duplex.

[25] Joseph E. Daly, also a state's witness, resided at 68 Crescent Street.

[26] The fifth amendment to the United States constitution, which is made applicable to the states by virtue of the fourteenth amendment, provides in relevant part: "No person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."

v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L.
Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14
L. Ed. 2d 730 (1965). . . . Our legislature has given
statutory recognition to this right by virtue of its enact-
ment of General Statutes § 54-84.[27] In determining
whether a prosecutor's comments have encroached
upon a defendant's right to remain silent, we ask: Was
the language used manifestly intended to be, or was it
of such character that the jury would naturally and
necessarily take it to be a comment on the failure of
the accused to testify? . . . Further, in applying this
test, we must look to the context in which the statement
was made in order to determine the manifest intention
which prompted it and its natural and necessary impact
upon the jury. . . . Finally, [w]e also recognize that
the limits of legitimate argument and fair comment can-
not be determined precisely by rule and line, and some-
thing must be allowed for the zeal of counsel in the
heat of argument." (Citations omitted; internal quota-
tion marks omitted.) *State* v. *Haase*, 243 Conn. 324,
332–33, 702 A.2d 1187 (1997). With these principles in
mind, we turn to the defendant's claim.

We conclude that the first challenged comment,
namely, "We didn't edit anything. We [gave] you all the
witnesses who could give you any information about
this case," did not implicate the defendant's right to
refrain from testifying, but, rather, represented an
attempt by the state's attorney to draw a distinction
between the state's evidence, on the one hand, and the
redacted transcript of Notice's guilty plea, on the other.

---

[27] General Statutes § 54-84 provides in relevant part: "Testimony or silence
of accused. (a) Any person on trial for crime . . . at his or her option may
testify or refuse to testify upon such trial. The neglect or refusal of an
accused party to testify shall not be commented upon by the court or
prosecuting official, except as provided in subsection (b) of this section.

"(b) Unless the accused requests otherwise, the court shall instruct the
jury that they may draw no unfavorable inferences from the accused's failure
to testify. . . ."

Although the comment improperly highlighted the fact that several pages of the transcript had been withheld from the jury; see part I C of this opinion; it is clear that the remark served only to underscore that fact, and not the defendant's failure to testify.

We also conclude that the statements "I gave you everything I had. I didn't excerpt anything" reasonably cannot be construed as a comment on the defendant's silence. Those remarks immediately followed the state's attorney's observation that, as in most cases of arson, the fire in this case had been set at night, a point made by the state's attorney to explain why the state had been unable to produce an eyewitness to the crime. Viewed in the context in which it was spoken, the statement "I gave you everything I had" served to emphasize that fact, and nothing more. Moreover, although the assertion "I didn't excerpt anything" may be construed as an oblique reference to the fact that the defendant had submitted an excerpted transcript of Notice's guilty plea, the statement reasonably cannot be construed as one that the jury "naturally and necessarily" would have interpreted as a comment on the defendant's failure to testify. Finally, because the defendant made no objection to the statements at trial, we may presume that he did not consider the comments to be seriously prejudicial at the time they were made. See *State* v. *Robinson*, supra, 227 Conn. 746. We therefore reject the defendant's claim that the state's attorney's argument encroached upon the defendant's constitutional right to refrain from testifying.

## II

The defendant next claims that the trial court improperly allowed the state to introduce into evidence a videotape of the fire and six slide photographs of the deceased victims. We disagree.

The following additional facts are relevant to our resolution of the defendant's claims. The state sought

to introduce into evidence a fifteen minute videotape of the fire that had been taken by neighbors of the victims. The state claimed that, because the videotape tended to establish the cause of the fire and its place of origin, it was relevant to demonstrate that the fire had been set intentionally. In addition, the state offered the videotape to show the structure of the duplex.[28]

The defendant did not object to having the jury view the first two to three minutes of the videotape. He did object, however, to any further showing of the videotape on the ground that it was not necessary to show more than the first several minutes of the film in order to establish the facts for which it had been offered and, further, that allowing the jury to view the entire videotape was likely to incite the jury's passions. After viewing the videotape, the trial court concluded that it was relevant[29] and that it contained nothing that was likely to inflame the emotions of the jury.[30] Consequently, the trial court overruled the defendant's objection, and the videotape was played in its entirety for the jury, accompanied by a narrative description of the events by Anthony Ramonas, a former member of the Waterbury fire department.

The state also sought to introduce into evidence twenty-two color photographs that had been converted to slides of the deceased victims. Twelve of the photographs had been taken at the medical examiner's office

---

[28] No photographs of the duplex were available.

[29] The court stated: "Obviously the state has the burden of showing or certainly has the right under the circumstances given the charges of showing the extent of the fire, that it was capable of causing death, that it was consistent with the intent to destroy as alleged, that the building was, in fact, destroyed. And the film, the fourteen or fifteen minutes, does show different views of that fire starting with a close-up of the front. There's distance shots. There's shots of the entire building in flames and there's finally a lot of the disintegration showing the total destruction of the building."

[30] The court stated: "[T]here's nothing about bodies. There's nothing about the woman on the porch. There's . . . no screaming. There's nothing of the type of evidence that would be strictly prejudicial under the circumstances."

and ten had been taken at the scene of the fire. In support of its claim of admissibility, the state argued that the photographs tended to establish that: (1) the fire had progressed from the front to the rear of the duplex; (2) the person who had set the fire intended to destroy the building; and (3) the building was inhabited. The defendant objected to the introduction of the photographs, claiming that their graphic nature was likely to inflame the emotions of the jury. The defendant also claimed that the state did not need the photographs in light of other evidence introduced by the state that tended to prove the elements of the crime of arson murder. The trial court upheld the defendant's objection as to sixteen of the photographs, concluding that their prejudicial impact outweighed their probative value. The court, however, overruled the defendant's objection to the remaining six photographs, each of which had been taken at the scene of the arson, after determining that they were not unduly inflammatory and that their probative value outweighed their prejudicial effect.[31]

Before addressing the merits of the defendant's claims, we first set forth the well established principles that govern our analysis of those claims. "This court has consistently held that photographic evidence is admissible where the photograph has a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry. . . . [Moreover] [t]here is no requirement . . . that a potentially inflammatory photograph be essential to the state's case in order for it to be admissible; rather, the test for determining the admissibility of the challenged evidence is relevancy and not necessity." (Internal quotation marks omitted.) *State* v. *Deleon*, 230 Conn. 351, 368–69, 645 A.2d 518 (1994); *State* v. *Williams*, 227

---

[31] Each of the photographs depicted one of the victims in the midst of debris at the scene of the fire.

Conn. 101, 111, 629 A.2d 402 (1993). Thus, although irrelevant evidence of a gruesome character is inadmissible, "[t]he prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 111–12; *State* v. *DeJesus*, 194 Conn. 376, 385, 481 A.2d 1277 (1984). Accordingly, " '[a] potentially inflammatory photograph may be admitted if the court, in its discretion, determines that the probative value of the photograph outweighs the prejudicial effect it might have on the jury.' " *State* v. *Deleon*, supra, 369; see *State* v. *Ross*, 230 Conn. 183, 277, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (even gruesome photographs may be admissible if they tend to prove or disprove material fact in issue). Furthermore, "a trial court has broad discretion in weighing the potential prejudicial effect of a photograph against its probative value. . . . On appeal, we may not disturb . . . [the trial court's] finding absent a clear abuse of discretion." (Citations omitted.) *State* v. *Doehrer*, 200 Conn. 642, 651, 513 A.2d 58 (1986).

Upon application of these principles, we conclude, after reviewing the videotape, that the trial court did not abuse its discretion in allowing the state to play the entire videotape for the jury. As the trial court stated, the videotape, along with other evidence presented by the state, tended to establish the cause and severity of the fire. Although it may not have been essential to the state's case that the jury be shown the entire videotape, the criterion for its admissibility was relevancy, not absolute necessity. See *State* v. *Deleon*, supra, 230 Conn. 369. Moreover, in light of the fact that the videotape contained no images of any of the victims or other occupants of the duplex, the trial court reasonably determined that the film contained nothing prejudicial to the defendant.

We reach the same conclusion with respect to the photographic evidence. First, we note that the trial court carefully scrutinized each photograph, bearing in mind that the state bore the burden of proving that the four victims had died in and as a result of the fire, and rejected all but six of the twenty-two photographs that the state had sought to introduce into evidence.[32] In contrast to the graphic photographs that the trial court rejected, five of the six photographs that the court allowed into evidence depicted bodies that were barely discernible amidst the debris of the fire. Although the sixth photograph depicted the body of three year old Tiana Winston with some greater clarity than did the photographs of the other victims, the trial court reasonably determined that none of the six photographs was particularly graphic or gruesome.[33] Because, "[i]n general, photographs of a corpse have been held properly admissible in prosecutions for homicide as against objections on the ground of prejudicial gruesomeness . . . or on the ground that they constituted merely cumulative evidence"; (citation omitted) *State* v. *Hanna*, 150 Conn. 457, 461, 191 A.2d 124 (1963); and in accordance with the principle that the trial court is afforded broad leeway in determining whether the probative value of such evidence outweighs its prejudicial effect, we conclude that the court did not abuse its discretion in permitting the state to introduce the six photographs into evidence.[34]

---

[32] The court rejected all twelve of the autopsy photographs, as well as four of the photographs taken at the scene of the fire, concluding that "they highlight the gruesome aspects of what fire does to . . . bodies and [they have] very minimal . . . probative value, particularly given all of the other evidence [adduced by the state] in this particular case."

[33] We have examined the six photographs that the state was permitted to publish to the jury, and we concur with the trial court's determination that the photographs were not unduly gruesome or inflammatory.

[34] The defendant also claims that the trial court should have excluded the videotape and the photographs because the defendant never contested the two elements of the crime of arson murder that the state sought to establish through that evidence, namely, that the fire had been set intentionally and

The judgment is affirmed.

In this opinion BORDEN, MCDONALD and PETERS, Js., concurred.

KATZ, J., concurring. I agree with the majority that the state's attorney's remarks do not warrant reversal of the defendant's convictions. I write separately, however, to express my dismay at the impropriety of the state's rebuttal argument.

It is well recognized that the state's attorney "is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should nonetheless be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone*, 96 Conn. 160, 168–69, 113 A. 452 (1921).

that the victims had died as a result of the fire. Contrary to the defendant's claim, the record is devoid of any stipulation or concession by the defendant regarding those two statutory elements. Accordingly, the defendant's claim must fail.

The defendant in the present case claims that the prosecutorial misconduct during the state's closing argument to the jury was so egregious that it deprived him of his constitutional right to a fair trial under the due process clause of both the state and federal constitutions. In analyzing the defendant's claim, the issue is whether the prosecutor's conduct " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), quoting *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); *State* v. *Hawthorne*, 176 Conn. 367, 372, 407 A.2d 1001 (1978). We do not focus alone, however, on the conduct of the prosecutor. " 'The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct.' " *State* v. *Palmer*, 196 Conn. 157, 163, 491 A.2d 1075 (1985), quoting *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see *Darden* v. *Wainwright*, supra, 180–81; *State* v. *Doehrer*, 200 Conn. 642, 654, 513 A.2d 58 (1986).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors." *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Included among those factors are the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Falcone*, 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) [cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982)]; the frequency of the misconduct; *State* v. *Couture*, 194 Conn. 530, 562–63, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); see *State* v. *Doehrer*, supra, 200 Conn. 654; *State* v.

*Palmer*, supra, 196 Conn. 164; the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States*, 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica*, supra, 1181; *Harris* v. *United States*, 402 F.2d 656, 657 n.1 (D.C. Cir. 1968); *State* v. *Doehrer*, supra, 654; and the strength of the state's case. See *United States* v. *Modica*, supra, 1181; *State* v. *Couture*, supra, 564; see also *State* v. *Glenn*, 194 Conn. 483, 492, 481 A.2d 741 (1984).

The parameters of the term "zealous advocacy" are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. *United States* v. *Modica*, supra, 663 F.2d 1179; *United States* v. *Drummond*, 481 F.2d 62 (2d Cir. 1973); 1 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 3, standard 3-5.8 (b), p. 3.87. Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. *Harris* v. *United States*, supra, 402 U.S. 658; 1 A.B.A., supra, standard 3-5.8 (b), p. 3.87. Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. *State* v. *Ferrone*, supra, 96 Conn. 168–69. Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence; *United States* v. *Modica*, supra, 1178–79; it is likely to infer that such matters precipitated the personal opinions. Finally, in fulfilling his duties, the prosecutor must confine the arguments to the evidence in the record. *State* v. *Binet*, 192 Conn. 618, 631, 473 A.2d 1200 (1984); *State* v. *Ferrone*, supra, 169. Statements as to facts that have not been proven amount to unsworn testimony that is not the subject of proper closing argument. 1 A.B.A., supra, standard 3-5.8 (a), p. 3.87.

Nevertheless, during closing argument the state's attorney in this case impermissibly vouched for the

credibility of the prosecution witness, Esmay Notice, by personally denying that he had entered into a secret agreement with her. In response to the defendant's argument that the jury reasonably could infer that the state had struck a deal with Notice to dismiss the aiding and abetting arson murder charges against her in exchange for her testimony, the state's attorney first referred to the claim as "[t]his big conspiracy I guess between me and Esmay Notice" and then denied the existence of a plea bargain, thereby testifying without affording the defendant the benefit of cross-examination. "[Defense counsel] wants you to believe that I made a deal with the murderers—with the murderer of Clarence Winston, Barbara Winston, Jostin Winston and Tiana Winston. He wants you to believe that I made a deal with the murderer of Clarence, Tarley and Tiana's parents. He wants you to think that I made a deal with the murderer of Tiana and Jostin Winston. He wants you to believe that I made a deal with the murderer of those people's parents and that woman's children. No way. No way." This response constituted a form of unsworn and unchecked testimony. The state's attorney, in effect, impermissibly testified without affording the defendant the opportunity to cross-examine him regarding the absence of a plea agreement, expressed his personal opinion that Notice was a credible witness for the prosecution, and suggested to the jury that to acquit the defendant, it must first "abandon confidence in the integrity of the government." *United States* v. *Goff*, 847 F.2d 149, 164 (5th Cir.), cert. denied, 488 U.S. 932, 109 S. Ct. 324, 102 L. Ed. 2d 341 (1988). This "implied 'voucher' for [Notice's] credibility invited the jury to view its verdict as a vindication of the prosecutor's integrity rather than as an assessment of guilt or innocence based upon the evidence presented at trial." *Floyd* v. *Meachum*, 907 F.2d 347, 354 (2d Cir. 1990).

A few moments later, the state's attorney referred to certain evidence that the trial court previously had ruled

inadmissible and then in his so-called apology exacerbated the problem. The state's attorney argued to the jury as follows: "You know, [defense counsel] said 'well, read the transcript, read the transcript [of Notice's guilty pleas].' I wish you could read the transcript. But you're not going to read what happened on August 10 when that plea was taken because [defense counsel] edited nine pages of that transcript. It was nine or eight or seven or whatever, nine pages of that transcript he wants to give you. That doesn't have in there what I said." Following the defendant's objection, which the court sustained, the state's attorney "apologized." "The last thing I meant to do or attempted to do was say [defense counsel] did anything wrong. The point I was trying to make is that is an edited transcript. You heard when I cross-examined the court reporter regarding the contents of that transcript. The state's case has no excerpts, no evidence left out. That's right. There's one hundred—[defense counsel] read you the thing. It's one hundred something pieces of evidence in. We didn't edit anything. We give you all the witnesses who could give you any information about this case."

These remarks improperly referred to evidence that had been excluded by the court. See *United States* v. *Vaglica*, 720 F.2d 388, 395 (5th Cir. 1983) (improper to "suggest to the jury that inadmissible evidence exists that bears against the defendant's case"); *United States* v. *Narciso*, 446 F. Sup. 252, 321–22 (E.D. Mich. 1977) (prosecutor's complaint to jury that " '[t]he Government hasn't even been allowed to present [certain] evidence' . . . implied strongly that evidence of the defendants' guilt existed which was not presented"); *People* v. *Emerson*, 97 Ill. 487, 497, 455 N.E.2d 41 (1983) (improper "to suggest that evidence of guilt existed which, because of defendant's objection, cannot be brought before the jury"); 88 C.J.S. 354–55 and nn. 56–58, Trial § 181 (a) (1955) ("improper for counsel to

argue or comment on excluded evidence, or to express regret that the court should have excluded certain evidence from the jury, or state that the excluded evidence was admissible"). Additionally, these remarks improperly criticized defense counsel for making objections that prevented admission of the redacted portions of the transcript; J. Stein, Closing Arguments (1996) § 16, p. 52 and n.2; and improperly vouched for Notice's credibility by "indicat[ing] that information not presented to the jury support[ed] [her] testimony." *United States* v. *Roberts*, 618 F.2d 530, 533 (9th Cir. 1980).

Despite the impropriety of these remarks, the defense counsel objected only once, apparently not finding the other comments sufficiently provocative or harmful. When the objection was made to the remarks on the excluded evidence, the trial court provided curative instructions, which were sufficient to obviate the harm caused by *those* comments. Although the other remarks deserved responses by defense counsel and the trial court; *Harris* v. *United States*, supra, 402 F.2d 657 n.1; I nonetheless agree with the majority that, in the context of the entire trial, the conduct was not so frequent or its impact so offensive to the judicial process as to require reversal of the defendant's convictions, nor were the remarks part of a pattern of prosecutorial misconduct requiring a new trial. Contra *State* v. *Williams*, supra, 204 Conn. 539–48. The fact that the error does not rise to the level of impropriety required to reverse a criminal conviction should not serve, however, as a sign that such patently impermissible behavior is to be tolerated.